OPINION OF THE COURT
Nat H. Hentel, J.
In this nonjury trial, plaintiff seeks damages for the consequences of an alleged false arrest and imprisonment he claims were initiated by the Board of Education of the City of New York.
FINDINGS OF FACT — PLAINTIFF’S VERSION
On May 16,1980, plaintiff, then a 17-year-old student at Bay side High School, decided to cut classes for the rest of his school day at 11:00 a.m., and left his school without permission. Plaintiff, in the company of four other black male youths aged 15 to 17, who were all about the same height (5 feet, 9 inches), except one, and who were all dressed casually in shirts and slacks, entered the schoolyard of the Louis Pasteur Junior High School, ostensibly to play basketball during a noon lunch break when the yard was filled with students. The junior high was about five miles distant from Bayside High School, and its student *110 population of approximately 1,000 pupils was 70% Caucasian, 25% black, and 5% oriental. Plaintiff testified that most of the “kids in the yard were younger” than he was.
At that particular time, the yard was filled only with white students. Thus, the five youths were the only blacks in the yard other than an adult black school security officer. The age level of the junior high’s pupils was between 12 and 14 years of age.
According to plaintiff’s testimony, he and one of his companions played handball, and the three others played basketball. The security officer allegedly asked plaintiff what he was doing in the yard, and then told the youths to leave. The five started to leave, and were next confronted by a white, bald-headed man “from the school, who was about six foot tall and had a brown mustache.” The man told them he had a report that “some guys were trying to rip-off some girls.” The response from the five was “Not zzs!” The man, whose name is unknown, then said “let’s go inside and we’ll talk about it.” The boys agreed, and voluntarily accompanied him into the school building. Plaintiff also testified that no one had tried to stop them from entering the schoolyard earlier, and that none of the five had spoken to any girls in the yard, but only to some boys.
Once inside the school principal’s office, the five youths were allegedly locked in the room, and were searched by the bald man. Two other men were reportedly in the room as well. When asked for his identification, plaintiff gave a false name, and said that he was a student at Junior High School 109 in Queens Village, which admittedly, was not true. Then police officers, some in uniform and some in plain clothes, arrived. The five youths were handcuffed, and transported to the 111th Precinct station house. Plaintiff claimed that the bald man also accompanied them to the station house where he “shuffled some papers”, and inquired if plaintiff wanted to make a phone call. When plaintiff answered in the negative, the bald man then telephoned plaintiff’s mother, and advised her that he was “the police”, and told her of her son’s arrest. Plaintiff was photographed, fingerprinted, strip-searched, placed in a series of holding cells for 10 hours; and then was trans *111 ported to Night Criminal Court Arraignment Part where he was charged with attempted robbery. The arraigning Judge released him on his own recognizance, and he was given a date to return with an attorney and his parents. Subsequently, the charge against plaintiff was dismissed for lack of prosecution.
Plaintiff returned to his school the next day, May 17, 1980. At school, he was allegedly subjected to “embarrassment, ridicule, and humiliation, and was made fun of for some time afterwards, and was referred to by some schoolmates as an ex con.”
While being detained at the junior high, plaintiff stated he was not told he was under arrest by any one, or that he could not leave prior to the arrival of the arresting police. (However, the dean of students of the junior high later testified that the five youths were not free to leave the school while waiting for the police to arrive.) Plaintiff, at one time during his testimony, stated that he asked to leave, and the bald man reportedly said “We ain’t leaving here tonight”. Plaintiff was the only witness to testify on his behalf as to the events at the junior high.
FINDINGS OF FACT — DEFENDANT’S VERSION
After plaintiff rested, the New York City Board of Education, the sole defendant, presented three witnesses who told a different version of the schoolyard occurrence.
Dean of Students Bruce Hollander testified that he was present in the junior high school building on May 16,1980. He had then been serving as acting assistant principal. It was about 12:45 p.m., when “some white girls, four or five, came into the main office,” and told him that “some boys confronted them moments before in the school yard, and had tried to take their jewelry; and that the five boys were black, and that they [the girls] ran away.” Dean Hollander stated that the girls were “nervous, excited, and scared; and that no other description was given or taken” concerning the alleged perpetrators.
The dean, along with a gym teacher (Mr. Schneider), and two black security guards (none of whom was bald, or tall, or had a brown mustache), immediately went to the schoolyard which was empty of all students, and “walked right *112 into five black youths who were then the only young people in the yard.” Mr. Hollander reportedly asked “Boys, what are you doing here? Come inside, we want to talk to you.” The five youths “meekly and quietly” followed Mr. Hollander into the principal’s office. Mr. Hollander further testified that no bald man was present while he, School Principal Sunshine, and the five youths were inside the building. The dean also stated that the five were not in attendance at the junior high, and that they all told him they were in attendance at Bayside High. The dean then notified the Bayside High authorities as to their whereabouts. Mr. Hollander next told the youths that he had been informed “they did certain things and were asked why they were at Louis Pasteur.” No satisfactory response was forthcoming. The five denied attempting to steal jewelry from some girls. The dean then called the police, and told the police “we have some intruders who, he had been told, attempted to steal property from some students.”
During the short time before the police arrived, the four girls allegedly involved were asked to view the five through a window into the principal’s office where they were seated. This was within the hour of the alleged occurrence. All the girls positively identified the youths as the perpetrators. It is to be noted that the five were the only black youths seated in the principal’s office at that time. Upon arrival, the police interviewed the complaining girls, took a signed statement from one of them, and conducted a “showup” of the youths through the principal’s office window. When the police took the youths to the precinct station house, no board of education employee accompanied them in the transporting vehicles, or into the station house; no board of education employee made any accusation against the five; nor did any board employee point out any one of the five to the police; nor did any board employee sign any accusatory instrument, or identify any of the five to the police. It is conceded by plaintiff’s attorney that after their removal from the school building, whatever next occurred was strictly a police operation within the normal routine of police procedure following an arrest.
*113 Two of defendant’s witnesses were two of the complaining girls who were 13 years of age at the time of the incident. On that day, about 12:45 p.m., according to their testimony, they and two other school girls were slowly walking from the yard back to the school building, but were prolonging the process of going back to class. “Their path became blocked by five black males who surrounded them. One was very tall, about six foot two inches, one was short, three others were of medium height, and were 16 to 17 years of age (one might have been 19), and all appeared to them as being too old to go to their school.” The girls testified that the five acting together demanded of them: “Where you going? Bitch! Give us all your fucking gold! Take if off!” The girls admittedly became frightened, and they ran, with the five youths in pursuit for about 40 feet, until the girls ran inside the school building. Each of the youths, apparently before the chase began, had stationed himself within a foot of each girl, and had come to a face-to-face confrontation. Indeed, according to their testimony, it was a menacing confrontation by five young males who “looked very old, maybe about 18” to 13-year-old girls. There was no physical contact between the boys and girls; only verbal contact. The girls “panicked”. Inside the school, the girls told Dean Hollander “that some guys in the yard had tried to rip them off.” The dean and three other men went outside in a hurry to intercept the youths.
After both sides rested, plaintiff moved for judgment on the pleadings, and for $10,000 in damages based upon the insult, restraint, arrest, imprisonment, and its subsequent humiliation, and embarassment not only based upon what happened at the school, but also by the following police action leading to arraignment later that evening. Plaintiff claims that since the board of education, through its employees, initiated the action and the arrest, it should also be held liable for the consequences of the arrest after the police took custody of the youths. It should be noted that plaintiff is only suing the Board of Education of the City of New York, and not the New York City Police Department, or any of the school officials involved, or any of the complaining young girls. Further, plaintiff’s mother is also suing the board of education for $750 damages incurred in *114 hiring a lawyer to prosecute her son’s cause of action, and for her loss of earnings and transportation costs involved while she appeared in court on two days for this trial. Originally, when the suit was commenced, she was a party plaintiff on behalf of her then infant son, who is now 19 years of age, suing on his behalf as his mother and natural guardian. Plaintiff also seeks punitive damages. It should be noted, that plaintiff has completely failed to prove that “the bald man”, whom he claims was the principal actor on behalf of defendant in detaining the five youths, was an employee, officer, agent or other official of the board of education, and that he was then acting for the board during this entire incident.
Defendant has moved to dismiss the causes of action because defendant was “justified” in detaining the youths who, obviously were not students at the junior high; who also were apparently of school age; and who were apparently truant from their attendance at their own high school. Thus, it is claimed by the Corporation Counsel on behalf of the board that under the State Education Law, it had the responsibility and duty to detain and report observed apparent truants to the proper school authorities. Further, Corporation Counsel claims that school officials must act in loco parentis for pupils assigned to their care, and to keep them safe and harmless from attack or threat of attack. Under such reasoning, defendant claims that the actions of its employees in response to the alleged incident were reasonable, appropriate and justified under all the circumstances which created “probable cause” to detain the five youths for appropriate police action.
CONCLUSIONS OF LAW
The protection and security of school children have long been a paramount concern to legislators, educators, parents, and the public in general. It is so universally recognized that it has been codified in the Education Law of the State of New York, and memorialized in court decisions throughout the State. It is in this light that the reasonableness of the board of education’s actions in this case must be judged.
The Court of Appeals in Broughton v State of New York (37 NY2d 451, 456), in an attempt to dispel confusion set *115 forth in detail the elements of false imprisonment: “The action for false imprisonment is derived from the ancient common-law action of trespass and protects the personal interest of freedom from restraint of movement. Whenever a person unlawfully obstructs or deprives another of his freedom to choose his own location, that person will be liable for that interference * * * To establish this cause of action the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged” (emphasis added).
Thus, the issue of liability for false imprisonment will necessarily turn on whether Mr. Hollander’s actions on behalf of the board of education were justified.
It is this court’s opinion that the absence of liability here on the part of the board of education stems from authority imparted under the Education Law and case law.
Section 3213 (subd 2, par a) of the Education Law gives the board of education authority to detain any student who is unlawfully absent from instruction in the following manner: “A supervisor of attendance, attendance teacher or attendance officer, as the case may be, may arrest without warrant any minor who is unlawfully absent from attendance upon instruction. He shall forthwith place the minor so arrested in attendance upon required instruction and shall notify the parent or guardian of the minor, and he may then begin proceedings for his commitment as a school delinquent or arraign him before a court having jurisdiction.”
Here, Mr. Hollander, as acting assistant principal, had the obvious authority to supervise attendance. Plaintiff readily admitted that he was truant. His own wrongdoing placed him in a position where he could be stopped, detained, and questioned for a reasonable time as to his school status.
Plaintiff’s argument that the only school official allowed to make arrests is a supervisor of attendance (citing Education Law, § 3213), has been controverted by the State’s highest court. It was held in Matter of Young v Board of *116 Educ. (35 NY2d 31, 35), that a principal or assistant principal may assume and perform all functions of a duly appointed attendance supervisor, teacher, or officer, providing the minimum requirements of subdivision 1 of section 3213 of the Education Law “that a person who performs as an attendance teacher be ‘a teacher licensed to teach in New York state’ ” are met.
There is little doubt the board of education, through the person of Mr. Hollander, acted within its statutory mandate. Having personal knowledge that plaintiff was not a student at Louis Pasteur Junior High School, he was legally justified in directing plaintiff into the school building to determine his identification and school of attendance.
Case law speaks to the duty of public school authorities to secure the school children under their control: “‘A school official, standing in loco parentis to the children entrusted to his care, has, inter alia, the long-honored obligation to protect them while in his charge, so far as possible, from harmful and dangerous influences’ ” (People v Bowers, 77 Misc 2d 697, 699, citing People v Jackson, 65 Misc 2d 909).
In People v Scott D. (34 NY2d 483, 486), the Court of Appeals specifically discussed the duty of school officials to protect and be aware of any harmful influences in and around school grounds.
“Public school authorities have special responsibilities, and therefore correspondingly broad powers, to control the school precincts in order to protect the students in their charge * * * The obligation to maintain discipline and provide security derives from State law and is delegated by local boards of education * * *
“To the extent that public school teachers are responsible for the education, discipline and security of their charges, they are, to a degree like parents.”
The “broad powers” spoken of by the Court of Appeals mandated Mr. Hollander immediately to seek out the five black youths who had allegedly attempted to “rip off” jewelry from some school girls on their way back to classes.
*117 After a brief detention for the purposes of inquiring into their presence, and confirming their identification and home school, then, Mr. Hollander properly called the police, and reported that he had a complaint of an attempted robbery by some schoolyard intruders and who were identified by the complainants. This action was well within the scope of Mr. Hollander’s authority. The subsequent arrest and taking into custody of plaintiff by the police resulted from independent police action based upon a “showup” conducted by them upon their arrival, and a written signed statement taken by the police from one of the alleged victims.
While plaintiff correctly cites the rule where an arrest is made by a defendant who directs a police officer to take plaintiff into custody, rather than merely communicating facts or grounds of suspicion leaving the police officer to act on his own judgment and responsibility, it is defendant, not the police who is accountable for any false arrest. Such is not the case here. (See Sanders v Rolnick, 188 Misc 627.) Indeed, “communicating facts or grounds of suspicion” was exactly what Mr. Hollander did.
The testimony shows that the police independently asked the girls if they could identify the youths which they did; asked the girls for a statement which they obtained; and did not remove the plaintiff to the station house until this was accomplished by them.
Plaintiff must use caution not to confuse any criminal considerations with the civil issues here. The matter of whether the identification procedures were proper or whether a crime was indeed committed are not within this court’s jurisdiction.
The law is clear that a defendant in a false arrest action will not be held liable for police detention unless it is shown that the police are not acting on their own volition but rather were carrying out the express directions or demands of the defendant. The law requires much more than mere intervention, or furnishing information, or calling for police assistance. (Grinnell v Weston, 95 App Div 454; Vennard v Sunnyside Sav. & Loan Assn., 44 AD2d 727; Barnes v Bollhorst, 225 NYS2d 286.)
*118 It is this court’s determination, therefore, that the elements of false imprisonment need never be applied to the facts of this case under Broughton (supra).
In summary, a detailed review of the facts and the applicable law reveal that an official of the board of education did not act beyond the scope of his authority in inquiring what an obvious truant was doing on other than his home school grounds in the middle of a school day. The course, of action was reasonable, lawful, and justified. The scope of his responsibility was further extended under the in loco parentis doctrine.
Armed with a complaint of alleged criminal conduct made to him in his capacity as acting assistant principal, and accompanied by two security officers whose authority was to police the school grounds, Mr. Hollander then acted in the only reasonable way to fulfill his duty to insure the security of students entrusted to his care.
If the evidence had shown excessive force, or prolonged detention, or an unreasonable search, or conduct more properly befitting a police officer, then this holding would be different.
In carrying out his official duties and responsibilities, Mr. Hollander investigated the students’ complaints of attempted robbery on school grounds with full consideration of the realities of the moment.
Would not a delay in Mr. Hollander’s coralling of the alleged perpetrators have resulted in plaintiff’s imminent departure from the school grounds? Would not a failure to ascertain plaintiff’s identification have worked a dereliction of his prescribed duties under the Education Law? Would not a failure to call police promptly be contrary to this duty to act in loco parentis on behalf of his students?
The court is compelled to answer these questions in the affirmative. Therefore, under all of the circumstances, and the findings herein that defendant’s actions were reasonable, proper, justified and pursuant to law, the causes of action of plaintiff and his mother for damages are dismissed.