Margarita **LOPEZ** and Joyce
Ravitz, Plaintiffs,

v.

**CITY OF NEW YORK,**
et al., Defendants.

No. 93 Civ. 6516 (LAK).

United States District Court,
S.D. New York.

Oct. 13, 1995.

Order Denying Reconsideration
Oct. 17, 1995.

James I. Meyerson, New York City, for Plaintiffs.

Georgia Pestana, Sara Edelman, Assistant Corporation Counsel, Paul A. Crotty, Corporation Counsel of the City of New York, New York City, for Defendants.

KAPLAN, District Judge.

This is an action pursuant to 42 U.S.C. § 1983 and State law by two members of Community Board No. 3 ("CB3") against Luis Soler, the chairperson of the Board, Captain Guy R. Sino and Officer Tricia Fried of the New York City Police Department, and the City of New York. The gravamen of the complaint is that Soler caused Sino to arrest and maliciously prosecute the plain-tiffs, that Fried subjected them to unlawful strip searches at the precinct house, and that the City is responsible on various theories. Defendants move for partial summary judgment dismissing the bulk of the complaint. Plaintiffs move for leave to amend in order to clarify certain of their contentions. The motion for leave to amend is unopposed and therefore granted and the proposed pleading deemed interposed. As the Third Amended Complaint does not materially alter any of the issues presented on this motion, the motion is treated as being directed to the Third Amended Complaint.

### Facts

While certain of the details are in dispute, the overall context from which this action arises is not.

Plaintiffs Margarita Lopez and Joyce Ravitz both have been members of CB3, Lopez for most of the period since 1982 and Ravitz since 1991. Defendant Soler has been a member since 1986 and chairperson since 1992.

Meetings of CB3 typically began with a one-hour public session during which members of the public were permitted to speak briefly on a first-come-first-served basis provided they signed up in advance. The public session was followed by an executive session at which Board members discussed and voted upon various issues.

On June 22, 1993, CB3 held a meeting at which there was to be a discussion concerning a conversion of the "Glass House," an abandoned factory occupied by squatters, into low-income housing for people with AIDS. Soler, at least, was aware in advance that the issue might be controversial, and there was a significant police contingent present at the meeting.

The Glass House was discussed during the public meeting, which began at about 6:30 p.m. At about 7:30 p.m., Soler took the microphone from a speaker and called the public session to a close despite the presence at the microphone of three or four persons waiting to speak. At that point, squatters sitting toward the rear of the audience began to rush the stage, shouting comments to the

general effect that the public session should continue. The police, who had been at the rear of the room, then descended to the front, forming a line in front of the stage and attempting to move the crowd out of the auditorium.

Matters spun somewhat out of control. The dais at which members of the executive board of CB3 sat was overturned. Some members of the audience stood up carrying signs with various squatter slogans. Others began yelling and shouting. Fire alarms went off. Lights were turned on and off. Stink bombs were thrown.

The parties disagree as to exactly what Lopez and Ravitz did amidst this furor. It is clear, however, that both were among eleven individuals arrested. Captain Sino was the arresting officer, and both claim that Soler directed Sino to arrest them.

When Lopez and Ravitz arrived at the police station, they were fingerprinted, photographed, asked to provide pedigree information, and, at various times, placed in a holding cell. Each was taken into a utility closet to be searched by Officer Fried, a female officer. Each was told to remove her outer clothing and to expose her undergarments. Officer Fried then searched plaintiffs' bodies in an allegedly intrusive and unjustified manner. Officer Fried conducted the searches pursuant to a policy authorizing searches of arrestees upon their arrival at the precinct. Plaintiffs later were issued Desk Appearance Tickets ("DATs") charging each of them with inciting riot and resisting arrest under N.Y. PENAL CODE §§ 240.08 and 205.30, Class A misdemeanors. Both plaintiffs were released at approximately 1 a.m. on June 23, 1993.

Subsequently, the District Attorney of New York County declined to prosecute the case, stating in a press release that prosecution was unwarranted because the charges could not be proven beyond a reasonable doubt.

*Plaintiffs' Claims and the Motion*

Plaintiffs claim that Soler held animosity toward them prior to the night of the riot at the CB3 meeting and that he had "vowed to get" Ravitz. They contend that the Board planned to hold an election for the chair position later that night and that Lopez and Ravitz did not support Soler. They assert that Soler would have lost the election had it been held on June 22, 1993 and that the termination of the meeting resulted in a postponement that served Soler's interests. They contend also that Soler directed the police to arrest them, despite the lack of any basis for such arrests.

The Third Amended Complaint contains thirteen causes of action. The first and second charge Soler and Sino with false arrest under State law and Section 1983, respectively. The third and fourth charge Soler with malicious prosecution, again respectively under State law and Section 1983. The fifth cause of action alleges that Soler's actions violated the First Amendment. The sixth and seventh are brought against Soler and assert that his actions intentionally inflicted emotional distress on the plaintiffs in violation of State law and Section 1983, respectively. The eighth and ninth causes of action allege malicious abuse of criminal process by Soler in violation of State law and Section 1983. The tenth cause of action seeks to hold the City responsible for the actions of the other defendants on the basis of *respondeat superior.* The eleventh cause of action is brought against Fried and charges that her searches of the plaintiffs violated Section 1983 and their Fourth Amendment rights. The twelfth and thirteenth causes, which were added by the Third Amended Complaint, seek to hold the City responsible for Fried's searches on *respondeat superior* and *Monell* grounds, respectively.

Defendants move for partial summary judgment dismissing the false arrest claims with respect to Soler, the malicious prosecution, abuse of process, and intentional infliction of emotional distress claims; and the unlawful search claim against Fried. The City's reply memorandum seeks dismissal of the recently added twelfth and thirteenth causes of action. Inasmuch as all parties have treated those issues as properly before the Court, the Court will consider them as well. The motion does not seek dismissal of the First Amendment claim against Soler,

the false arrest claim against Sino, or the tenth cause of action against the City except insofar as the dismissal of the underlying claims against the alleged tortfeasors would require dismissal of that *respondeat superior* claim against the City.

## Discussion

*False Arrest*

■ Defendants seek dismissal of the false arrest charges against Soler, arguing that Soler did not initiate the arrests.

■ A defendant who is not an arresting officer may be liable for false arrest if the defendant instigated an arrest by a police officer, knowing that there was no probable cause to believe that plaintiff committed a crime. However, if the officer decided, in the exercise of the officer's own discretion, to make the arrest, then a person providing information to the officer is not liable. *Rosario v. Amalgamated Ladies Garment, Etc.*, 605 F.2d 1228, 1248 (2d Cir.1979), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980); *Donnelly v. Morace*, 162 A.D.2d 247, 248, 556 N.Y.S.2d 605, 607 (1st Dept.1990); *Smalls v. Board of Education*, 114 Misc.2d 109, 117, 450 N.Y.S.2d 987, 992 (Civ.Ct. Queens Co.1982); *cf.* Prosser and Keeton on Torts § 11, at 52 (5th ed. 1984) (hereinafter Prosser).

In seeking dismissal, defendants maintain that the arresting officer, Captain Sino, exercised his own discretion in deciding to arrest plaintiffs. Plaintiffs allege that they observed Soler direct Sino to make the arrest. Thus there is a material factual dispute and the Court denies summary judgment on this claim.

*Malicious Prosecution*

Plaintiffs' malicious prosecution claims under both Section 1983 and State law are directed against Soler. Plaintiffs accuse him of maliciously causing DATs to be issued to them without probable cause.

■ The elements of a malicious prosecution claim under New York law and Section 1983 are the same because the elements of a Section 1983 claim are borrowed from State law. *Cook v. Sheldon*, 41 F.3d 73, 78 (2d Cir.1994). Plaintiffs must establish that: (1) the defendant commenced criminal proceedings against them; (2) the proceedings terminated in plaintiffs' favor; (3) no probable cause existed for the proceedings; and (4) the defendant acted with actual malice. *Cook*, 41 F.3d at 78; *Russo v. State of New York*, 672 F.2d 1014, 1018 (2d Cir.1982).

■ The first element of the malicious prosecution claim has been satisfied, as the issuance of a DAT qualifies as the commencement of a criminal proceeding for purposes of a malicious prosecution claim. *Rosario*, 605 F.2d at 1250; *accord, Snead v. Aegis Security Inc.*, 105 A.D.2d 1059, 482 N.Y.S.2d 159 (4th Dept.1984). There plainly are disputed issues of fact as to the existence of probable cause and malice. Hence, the defendants are entitled to dismissal of the malicious prosecution claim only if the District Attorney's declination of prosecution constituted a favorable termination of the proceedings commenced by the issuance of the DATs.

■ The question whether a district attorney's decision not to proceed against one charged with an offense in a DAT is troublesome. Unfortunately, the cases dealing with the pertinent situations have reached varying results that are difficult to reconcile.

In *Cook v. Sheldon*, 41 F.3d 73, the Second Circuit held that the dropping of criminal charges following arraignment constituted a favorable termination. In doing so, it relied on *Loeb v. Teitelbaum*, 77 A.D.2d 92, 100–01, 432 N.Y.S.2d 487, 493–94 (2d Dept.1980), which stands for the proposition that the formal abandonment of proceedings by a prosecutor constitutes a favorable termination provided it was not procured by the malicious prosecution plaintiff. *Cook* therefore suggests that the declination of prosecution in this case is sufficient.

*Loeb*, however, was decided prior to *Ryan v. New York Telephone Co.*, 62 N.Y.2d 494, 478 N.Y.S.2d 823, 467 N.E.2d 487 (1984). In that case, the plaintiff was discharged from his position for theft. His application for unemployment insurance benefits was denied on the ground that he was fired on the basis of his own misconduct. He was prosecuted

criminally as well, but the case was dismissed, on motion of the prosecution, "in the interest of justice" pursuant to N.Y.CRIM. PROC.L. ("CPL") § 210.40.[1] The Court of Appeals held that the dismissal in the interest of justice did not constitute a termination of the criminal proceeding favorable to the accused:

> "[T]he eventual dismissal of the criminal charges on the motion of a prosecutor 'in the interest of justice' does not constitute an adjudication of the veracity of the charges. Consequently, it in no way undermines the force and effect of the administrative determination. A dismissal 'in the interest of justice' is neither an acquittal of charges nor any determination on the merits. Rather, it leaves the question of guilt or innocence unanswered." 62 N.Y.2d at 504–05, 478 N.Y.S.2d at 828.

While *Ryan* might have been read narrowly in light of the existence of the prior administrative determination of guilt and the lack of evidence as to the reason for dismissal, it typically, although not uniformly, has been read expansively for the proposition that dismissals in the interest of justice are not terminations favorable to the accused as a matter of law, as indeed the Second Circuit held in *Hygh v. Jacobs,* 961 F.2d 359, 367–68 (2d Cir.1992).[2] Inasmuch as one of the factors on which such a dismissal may be based is the evidence of guilt, CPL §§ 170.40, subd. 1(c), 210.40, subd. 1(c), or lack thereof, a dismissal in the interest of justice may reflect nothing more than the prosecutor's judgment, approved to be sure by the court, that the evidence is insufficient to proceed. This is essentially what happened here.[3] Hence, *Ryan,* at least as read by *Hygh,* cuts strongly in defendants' favor. *Cook,* however, cited

neither *Hygh* nor *Ryan* and *Ryan* did not discuss *Loeb.*

When one delves beneath these recent cases, the picture does not became appreciably clearer. Many authorities generally indicate that a voluntary dismissal by a prosecutor, or the entry of a *nolle prosequi* without the plaintiff's procurement, is a favorable termination. 1 FOWLER V. HARPER AND FLEMING JAMES, JR., THE LAW OF TORTS § 4.4, at 308–09 (1956); RESTATEMENT (SECOND) TORTS § 659(c) and *comment e* (1977); *contra Fogg v. First National Bank of Boston,* 268 Mass. 25, 167 N.E. 251 (1929) (*nolle prosequi* "for lack of evidence sufficient to convict" not favorable termination). On the other hand, *Halberstadt v. New York Life Insurance Co.,* 194 N.Y. 1, 86 N.E. 801 (1909), one of the seminal New York cases in the area, spoke of a need for termination "by judicial action ... in any way involving the merits or propriety of the proceeding," thus implying, albeit in *dicta,* that a prosecutorial decision alone would not suffice. One accommodation of these views would be a holding that an abandonment by the prosecutor in circumstances which fairly imply a lack of reasonable ground for the prosecution constitutes a termination favorable to the accused. *See Loeb v. Teitelbaum,* 77 A.D.2d at 100, 432 N.Y.S.2d at 493. But such a rule would not be without its difficulties.

First, such a rule could provide a disincentive for a prosecutor to abandon a prosecution, at least in the manner done here. The prosecutor might well take into account that the abandonment, particularly an abandonment that in effect announced the prosecutor's view that the defendant was not culpable, could open the door to civil liability, often

---

**1.** It should be noted that Section 210.40 pertains to dismissals of indictments "in the interest of justice," whereas the dismissal of informations and other complaints on such grounds is governed by Section 170.40. The standards for dismissal under the two statutes are identical.

**2.** *Accord, Manno v. State,* 176 A.D.2d 1222, 576 N.Y.S.2d 717 (4th Dept.1991); *MacLeay v. Arden Hill Hospital,* 164 A.D.2d 228, 231, 563 N.Y.S.2d 333, 334–35 (3d Dept.1990), *leave to appeal denied,* 77 N.Y.2d 806, 568 N.Y.S.2d 913, 571 N.E.2d 83 (1991); *Jackson v. County of Nassau,* 123 A.D.2d 834, 507 N.Y.S.2d 449, 450 (2d Dept.

1986), *leave to appeal denied,* 69 N.Y.2d 608, 516 N.Y.S.2d 1023, 509 N.E.2d 358 (1987); *contra, Hankins v. Great Atlantic and Pacific Tea Co.,* 208 A.D.2d 111, 622 N.Y.S.2d 678 (1st Dept. 1995) (holding that dismissal "in the interest of justice" in some circumstances is a favorable termination and arguing that *Ryan* has been misconstrued).

**3.** The only difference is that the court reviewed the prosecutor's judgment in *Hygh,* but not here. This makes *Hygh* a stronger case for the plaintiff than this one.

liability of law enforcement personnel upon whom the prosecutor depends. Given a choice between a rule creating no such disincentive and, on the other hand, one involving a risk that a prosecutor would act less favorably toward the accused than is warranted in order to protect complainants, the former may be the more desirable.

Second, although the prosecutor in this case publicly announced that he would not proceed for want of sufficient evidence of guilt, the reasons for abandonment of prosecutions often are not so readily accessible. The desirability of opening the door to discovery of the reasons for prosecutorial decisions—which could be a natural product of making the favorable termination issue turn on the basis for the decision—is not self-evident.

Third, one perhaps should not ignore differences in the experience, resources, professionalism and independence of those responsible for prosecutorial decisions. In New York State, the range runs from the summit of the storied office built by Thomas E. Dewey, Frank Hogan and Robert Morganthau, to part-time district attorneys in rural counties, to local prosecutors before village justice courts who may be called upon very infrequently indeed.[4] It is one thing to accept a statement made by the District Attorney of New York County. Whether a rule according the same treatment to the stated bases for all prosecutorial decisions, or requiring differentiation among prosecutors, would be a good one at least bears consideration.

If resolution of the favorable termination question could obviate the need for, or substantially affect the scope of, the trial, the Court would decide the matter now. The false arrest claims against Soler, however, will be tried in any event. Litigation of the malicious prosecution claims will add little if anything to the trial. If those claims are tried, they may be resolved in defendants' favor on other grounds, thus eliminating the need to decide this issue. Moreover, there is substantial reason to believe that the suffi-

ciency of the malicious prosecution counts in this case is of no practical significance. In the event plaintiffs are entitled to recover for malicious prosecution, their damages would be those suffered, if any, in consequence of their having been issued DATs pursuant to which they never were obliged to appear in court and never were prosecuted. If they suffered injury connected with the charges made against them that is compensable in this case, it quite likely flowed from the arrests rather than the prosecutions. The prudent course is to try the malicious prosecution claims, to take a special verdict, and to decide the favorable termination issue only if it proves necessary to do so in circumstances in which the issue is posed on a complete factual record and the parties may brief the matter more fully. *See* 10A Charles Alan Wright, et al., Federal Practice and Procedure: Civil § 2728, at 187–88, 191–92 (1983). In the circumstances, the motion for summary judgment dismissing the malicious prosecution claims is denied.

*Intentional Infliction of Emotional Distress*

■ Plaintiffs assert claims against Soler for intentional infliction of emotional distress against Soler under State law, and they advance the novel argument that this claim supports a cause of action under Section 1983 as well.

■ To prevail on their State law claim, plaintiffs must show, among other things, that they were subjected to a campaign of harassment by defendants. *See Owen v. Leventritt,* 174 A.D.2d 471, 472, 571 N.Y.S.2d 25, 25 (1st Dept.), *leave to appeal denied,* 79 N.Y.2d 751, 587 N.E.2d 289, 579 N.Y.S.2d 651 (1991) (defendant's statement in public meeting that if the court refused to dismiss plaintiff's lawsuit against her, she would have no choice but to kill her, was insufficient to constitute intentional infliction of emotional distress); *Doe v. American Broadcasting Companies,* 152 A.D.2d 482, 483, 543 N.Y.S.2d 455, 455 (1st Dept.), *appeal dismissed,* 74 N.Y.2d 945, 549 N.E.2d 480, 550 N.Y.S.2d 278 (1989) (rape victims whose

---

**4.** *See also Curry v. Hosley* (3d Dept., Oct. 6, 1995) *reported in* N.Y.L.J. 1:5 (Oct. 12, 1995) (nonlaw-

yer may run for district attorney).

faces and voices allegedly were recognizable during a television interview despite the television station's assurance of anonymity could not maintain an action of intentional infliction of emotional distress); *Roberts v. Pollack,* 92 A.D.2d 440, 448, 461 N.Y.S.2d 272, 277 (1st Dept.1983) (complaint failed to state cause of action for intentional infliction of emotional distress because it alleged only one instance of aggravating conduct, instead of a series of acts necessary to establish a viable action); *see also* PROSSER § 12, at 61–62 (when claim is based on "abuse by defendant of some relation or position which gives the defendant actual or apparent power to damage the plaintiff's interests.... liability usually has rested on a prolonged course of hounding by a variety of extreme methods"). The conduct allegedly causing emotional distress here occurred in a single incident. At most, plaintiffs have alleged that Soler harbored a desire to inflict punishment on plaintiffs for an extended period of time. This does not amount to a campaign of harassment, and plaintiffs' claim must be dismissed.

 Plaintiffs argue also that the substantive due process component of the Fourteenth Amendment supports a Section 1983 claim for intentional infliction of emotional distress. The Court disagrees. The substantive component of the Due Process Clause is not a license for judges to proscribe whatever official actions offend their sensitivities. *See, e.g., Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 123–30 & n. 10, 112 S.Ct. 1061, 1068–70 & n. 10, 117 L.Ed.2d 261 (1992). In *Albright v. Oliver,* —— U.S. ——, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), the Court declined to ground a Section 1983 claim arising out of malicious prosecution in substantive due process, expressing strong reluctance to "expand the concept of substantive due process." *Id.,* 114 S.Ct. at 812. As the Court said in *Collins,* "the Due Process Clause 'does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that

attend living together in society ...'" *Collins,* 503 U.S. at 127, 112 S.Ct. at 1070 (quoting *Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1989)).

Here, plaintiffs' grievances relate to the allegedly improper arrests and prosecutions. They have ample remedies for both under State law and Section 1983. There is neither need nor, more important, basis for creating a new constitutional tort to add another string to their bow.[5]

*Abuse of Process*

 Abuse of process under Section 1983 and New York law occurs when defendants (1) employ regularly issued legal process to compel performance or forbearance of some act, (2) with the intent to do harm without excuse or justification, (3) in order to obtain a collateral objective beyond the legitimate ends of the process. *Cook,* 41 F.3d at 80. The pursuit of a collateral objective must occur *after* the process is issued; the mere act of issuing process does not give rise to a claim.[6] *PSI Metals v. Firemen's Insurance Co. of Newark, N.J.,* 839 F.2d 42 (2d Cir.1988) (finding no abuse of process where the defendant merely filed a counterclaim with the intent that the plaintiff expend money in defending the claim); *Perry v. Manocherian,* 675 F.Supp. 1417, 1429 (S.D.N.Y. 1987) (issuance of a summons and complaint, even if made with the intent to coerce settlement and create bad publicity for the defendant, does not constitute abuse of process); *Curiano v. Suozzi,* 63 N.Y.2d 113, 117 480 N.Y.S.2d 466, 468, 469 N.E.2d 1324, 1326 (1984) (malicious motive in issuing a summons does not establish abuse of process); *Williams v. Williams,* 23 N.Y.2d 592, 596, 298 N.Y.S.2d 473, 476, 246 N.E.2d 333, 335 (1969) (plaintiff's claim that an action was brought against him solely for the purpose of ruining his business reputation was insufficient to establish abuse of process).

---

**5.** Given this conclusion, plaintiffs' request for leave to amend to refine their emotional distress claim is denied.

**6.** *Cook* is not to the contrary. In *Cook,* defendants allegedly arranged a fraudulent arraignment of plaintiff and thereafter let him languish

in jail to exact retribution. The plaintiff in *Cook* thus was subjected to abuse of process after it was issued by remaining in jail to satisfy the retributive intent of plaintiffs. The Court held that this was actionable abuse of process.

■ Here, plaintiffs were not subjected to ongoing abuse—after being issued DATs, they simply were sent home. The fact that they would have been required by law to appear in response to the DATs, had the cases not been dropped, does not make out an abuse of the DAT. Rather, some other abuse of the DATs after they were issued would have been necessary, such as the use of the DATs to extort a payment or other concession. Plaintiffs' abuse of process claims therefore are dismissed.

*Unlawful Search*

■ Defendants seek dismissal of plaintiffs' claims that Officer Fried conducted "strip searches," a highly intrusive procedure, without justification, in violation of Section 1983 and their Fourth Amendment rights.

The parties dispute whether the searches Officer Fried conducted are characterized accurately as strip searches. It is more useful to focus on precisely what happened, viewed in the light most favorable to the plaintiffs.

Ms. Lopez testified that she and Ms. Ravitz were arrested and taken to the precinct, where there were placed in a "cage" with three other women. (PX 8, at 103; PX 10, at 9) At some point, she was taken into a closed room by a policewoman who had Lopez take off her shirt, drop her pants, and remove her shoes and then searched Lopez's legs. (PX 8, at 103–04; PX 10, at 12–23) Lopez was not asked to remove the camisole she wore beneath her shirt. (PX 10, at 17) The officer patted her down thoroughly, touching Lopez beneath her underwear. (*Id.* at 17–21) No one else was present. (*Id.* at 15) Lopez was not completely naked at any point. (*Id.* at 21) She then was returned to the cell. (PX 8, at 104)

Ravitz told a similar story. After Lopez was searched, Ravitz was taken from the cage into small room or closet and there searched by a policewoman. (PX 9, at 88; PX 10, at 70–72, 80). Ravitz was told to unbutton and open her blouse and to remove her shoes. (PX 10, at 74–75) She did not recall whether she dropped or lifted her skirt. (*Id.* at 75, 77) She was not naked at any point. (*Id.* at 77) She recalled the officer touching her around her underwear. (*Id.*)

It is undisputed that these searches were conducted by Officer Fried and that she did so pursuant to a police policy authorizing searches of arrested persons upon arrival at the station house. The policy reads in relevant part:

"B. *SEARCH AT POLICE FACILITY*

(1) Upon arrival at precinct of arrest/or other department facility, the arresting officer or a designated member of the same sex as the prisoner, will conduct a thorough search of the subject's person and clothing to ensure the safety of all persons within the facility and to remove weapons, contraband and evidence not discovered by the frisk. Other items removed lawfully carried but that are dangerous to life, will also be removed from the subject.

"(2) A search at the police facility (not a 'strip' search) includes the removal of outer garments such as overcoats, jackets, sweaters, vests, hats, wigs, ties, belts, shoes and socks, handbags, and wallets. All pockets are to be emptied and all clothing not removed will be examined by grabbing, crushing and squeezing the garments and by sliding the hands across the body to detect articles that may be underneath or sewn to the clothing." (PX 38, at 7) [7]

The policy further instructs officers to examine fronts and sides of chest, bras for concealed articles, waist, buttocks, thighs and legs, the lower abdomen and crotch. Officers are to remove contraband, as well as other items that might be dangerous (e.g., shoelaces, belts), facilitate escape (e.g., ball point pens), or be used to deface or damage

---

7. Another section of the policy authorizes what it calls a "strip search" if the arresting officer reasonably believes that the suspect is carrying weapons or contraband. Such a "strip search" is not defined in much detail; it is explained as follows:

"A strip search will be conducted by a member of the same sex in the utmost privacy and with no other arrestee present. It should not be necessary to touch the subject's body, except for examination of the hair." (PX 38, at 7)

property (e.g., lipstick, keys, pencils, mirrors, etc.). (PX 39, at 3).

Most cases attacking searches of arrestees deal with situations in which the arrestee was required to disrobe entirely or subjected to even more intrusive procedures. In *Weber v. Dell*, 804 F.2d 796 (2d Cir.1986), for example, the Second Circuit held that a strip-body cavity search of one arrested on a misdemeanor charge was unconstitutional given that the police lacked any reasonable suspicion that the arrestee was carrying a concealed weapon or contraband.[8] In substance, defendants would have the Court draw from *Weber* the general proposition that searches that stop short of complete nakedness are reasonable *per se.* Such a broad pronouncement, however, cannot be squared with *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), which held that the Fourth Amendment requires a "balancing of the need for the particular search against the invasion of personal rights that the search [of a prisoner's body] entails," accounting for the "scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559, 99 S.Ct. at 1884.

■ Police officers are entitled to conduct reasonable searches of arrestees, regardless of the charges on which the arrests are based, in order to protect law enforcement facilities and personnel, as well as persons in police custody. In determining whether a given search is reasonable, however, the Court must consider the degree of intrusion, the extent to which the circumstances suggest a possible safety risk, and the manner in which the search is conducted.

In this case, a trier of fact might well conclude that the searches at issue were intrusive and that the police had little if any reason to think that these plaintiffs were likely to be carrying weapons or contraband. *See* Comment, *The Constitutionality of Policies Requiring Strip Searches of All Misde-*

meanants and Minor Traffic Offenders, 45 U.Cin.L.Rev. 175, 186–87 (1985). At least equally significant, a trier might conclude that the searches were conducted in a manner that was not reasonably designed to serve the stated goal of security. Five arrestees were in a single cell, and it appears that they were taken from the cell, searched, and then returned to the cell one at a time. In consequence, had one of the five been carrying a weapon, it seems that the searches may have been conducted in such a way that the weapon could have been passed from one to another without ever being discovered. If the trier so found, the searches might be held unreasonable. In consequence, the Court holds that there is a genuine issue of fact material to the determination of the constitutionality of the searches. This does not entirely dispose of the matter, however, as Officer Fried's defense of qualified immunity and the sufficiency of the *Monell* and *respondeat superior* claims against the City with respect to the searches remain.

■ Officer Fried may be held liable only if a reasonable person in her position would have been chargeable with knowledge that her actions violated the clearly established rights of the plaintiffs. While the unconstitutionality of unreasonable searches certainly was established at the time these searches took place, the immunity question must be considered at a more detailed level of factual specificity. *See Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Mozzochi v. Borden*, 959 F.2d 1174, 1178–79 (2d Cir.1992). The Second Circuit's decision in *Weber* dealt with a search considerably more intrusive than those at issue here. Plaintiffs have cited no authority supporting the view that a reasonable person in Officer Fried's position, assuming the facts to be as plaintiffs claim, was bound to know that these searches were unconstitutional, assuming *arguendo* that they were. In consequence, the Court holds that Officer Fried's actions, which were con-

---

8. Several other Courts of Appeals have held no-contact strip searches unconstitutional, at least where the charges on which the arrests were made might be characterized as minor, the likelihood of a concealed weapon was slim, and less intrusive means would satisfy legitimate security

objectives. *Jones v. Edwards*, 770 F.2d 739, 740–42 (8th Cir.1985) (leash law arrest); *Hill v. Bogans*, 735 F.2d 391, 394 (10th Cir.1984) (traffic arrest); *Logan v. Shealy*, 660 F.2d 1007, 1010 (4th Cir.1981) (DWI arrest).

sistent with and undertaken pursuant to written policies of the New York City Police Department, are protected by qualified immunity. The motion for summary judgment dismissing the eleventh cause of action therefore is granted. As there is no *respondeat superior* liability under Section 1983,[9] the twelfth cause of action must be dismissed as well. The searches, however, were undertaken pursuant to established City policy. Accordingly, the City's motion to dismiss the thirteenth cause of action is denied.

### Conclusion

The sixth, seventh, eighth, ninth, eleventh and twelfth causes of action are dismissed. Defendants' motion is denied in all other respects.

SO ORDERED.

### ORDER

KAPLAN, District Judge.

Plaintiffs move for reconsideration of this Court's order, dated October 13, 1995, insofar as it granted defendants' motion for partial summary judgment dismissing the sixth through eighth, eleventh and twelfth causes of action.

The office of a motion for reconsideration is to bring to the Court's attention matters or controlling decisions that have been overlooked, not to reargue points on which the Court and the movant disagree. *See* S.D.N.Y. Crv.R. 3(j).[1] Plaintiffs' counsel has ignored this. The motion is little more than a lengthy catalog of counsel's disagreement with the Court's resolution of issues tendered by the motion. Only two points warrant comment.

First, plaintiffs contend that the Court erroneously dismissed the twelfth cause of action, which seeks to hold the City liable on a *respondeat superior* theory for the allegedly unlawful searches by Officer Fried. Plaintiffs argue that the City could be liable on such a theory, notwithstanding the immunity enjoyed by Officer Fried, if Officer Fried would have been liable under State law but for her immunity. The problem with plaintiffs' argument is that the eleventh cause of action, which is the claim against Officer Fried for damages arising from the allegedly unlawful searches, is premised exclusively on the contention that Officer Fried "violated the Plaintiff's [*sic*] rights as guaranteed under the Civil Rights Act of 1871, 42 U.S.C. Sections [*sic*] 1983, and the Fourth Amendment to the United States Constitution." (Third Amended Complaint ¶ 63) There is no State law claim. As the only claim against Officer Fried is based on the alleged violation of plaintiffs' federal constitutional rights, and as there is no *respondeat superior* liability against Officer Fried's employer for any such violation,[2] the twelfth cause of action was dismissed correctly.

 Second, plaintiffs argue at considerable length that the Court was "simply wrong" in holding that an element of abuse of process is misuse of process *after* the process is issued. They rely on *Cook v. Sheldon*, 41 F.3d 73 (2d Cir.1994). *Cook*, however, states:

> "While malicious prosecution concerns the improper issuance of process, '[t]he gist of abuse of process is the improper use of process after it is regularly issued.' 2 Committee on Pattern Jury Instructions, Association of Supreme Court Justices, New York Pattern Jury Instructions § 3.51 at 816 (1968)." *Id.* at 80.

As *Cook*, among other authorities, demonstrates, this is true of criminal as well as civil process.

The motion for reconsideration is denied in all respects.

SO ORDERED.

---

9. *Monell v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).

1. Plaintiffs have ignored also the prohibition on the submission of affidavits in support of such motions.

2. Plaintiffs do not dispute this.