**Felix TORRES, Plaintiff,**

v.

**John McLAUGHLIN, et al., Defendant.**

**Civil Action No. 96–5865.**

United States District Court,
E.D. Pennsylvania.

June 5, 1997.

Anthony L. Cianfrani, Philadelphia, PA, for Plaintiff.

John O.J. Shellenberger, III, Office of Atty. Gen. Philadelphia, PA, for Com. of Pennsylvania.

Shelly Smith, Asst. City Solicitor, City Philadelphia Law Dept., Philadelphia, PA, for McLaughlin, Sunderhauf and City of Philadelphia.

### MEMORANDUM

DALZELL, District Judge.

Plaintiff Felix Torres instituted this suit under 42 U.S.C. § 1983 and the laws of the Commonwealth of Pennsylvania against defendants John McLaughlin, a police officer who worked for the City of Philadelphia and the Pennsylvania Attorney General's Bureau of Narcotics Investigations, John Sunderhauf, Zone Commander for the Attorney General's Bureau of Narcotics Investigation, and the City of Philadelphia. Defendants, who earlier filed motions to dismiss which we granted in part and denied in part, *see Torres v. McLaughlin,* 1996 WL 680274 (E.D.Pa. Nov.21, 1996), now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

I. *Factual Background*

■ Rather than rehearse the factual allegations in this case, which despite the benefit of discovery have not materially changed from those alleged in the complaint, we will quote from our November 21, 1996 Memorandum:

[O]n June 2, 1994, while walking alone on the streets of Philadelphia, Torres was arrested by defendant John McLaughlin, a police officer for the City of Philadelphia and the Pennsylvania Attorney General's Bureau of Narcotics Investigations. McLaughlin then took Torres to the parking lot of the Office of the Pennsylvania Attorney General's Bureau of Narcotics Investigation, where McLaughlin allegedly threw Torres to the ground and assaulted him, kicking him in the back, shoulders, and sides. *See* Compl. at ¶¶ 10–11. Torres was ultimately charged with the manufacture, delivery and/or possession of a controlled substance, a felony under Pennsylvania law. *See* Compl. at ¶ 12.

On June 10, 1994, McLaughlin testified at the preliminary hearing that he had observed Torres engage in a drug transaction on June 2 and, after arresting Torres, had confiscated a quantity of controlled substances from him. *See* Compl. at ¶ 13. As a result of that allegedly perjured testimony, Torres was held for trial. *See id.*

McLaughlin testified against Torres again on April 13, 1995, at a pretrial hearing and, on September 29, 1995, at Torres's state trial, where Torres was found guilty of possession with intent to deliver controlled substances. *See* Compl. at ¶ 14. Torres claims McLaughlin gave perjured testimony at both the pretrial hearing and trial. *See id.* Following his conviction on September 29, Torres was remanded into custody. On April 18, 1996, Torres was sentenced to a term of thirty-six to seventy-two months incarceration, fined ten thousand dollars, and assessed one hundred ninety-one dollars in mandatory court costs. *See* Compl. at ¶¶ 15–16.

Torres remained incarcerated until May 13, 1996, when the Honorable Genece Brinkley "vacated his sentence, dismissed all charges, and ordered his immediate release from custody." Compl. at ¶ 17.

On August 26, 1996, Torres filed this suit ... [and] alleges in his complaint that ... defendants violated his "rights to be secure in his person and property, to be free from excessive use of force, and from malicious prosecution, and due process" as well as the "rights secured [to him] by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution." Compl. at ¶¶ 22–23.

*Torres,* 1996 WL 680274, at *1–2.

II. *Legal Analysis*

A. *Malicious Prosecution Claim* [1]

1. *Fourth Amendment Seizure*

In our November 21, 1996 Memorandum, we parsed through Torres's inartfully drawn complaint to decipher the possible constitutional deprivation alleged. We held that "there are three restraints on Torres's personal liberty that may constitute a sufficient deprivation of liberty to rise to the level of a constitutional violation: first, Torres's warrantless arrest on June 2, 1994; second, the preliminary hearing on June 10, 1994; and, finally, Torres's conviction on September 29, 1995, and his subsequent incarceration until May 13, 1996." *Torres*, 1996 WL 680274, at *4 (internal citations omitted).

We went on to hold that Torres's warrantless arrest on June 2, 1994, could not state a cause of action for false arrest, because Torres had filed this suit after the expiration of the two-year statute of limitations period for such a claim. *Id.* at *4–5; *see infra* n. 10.

We then ruled that, reading the complaint in the light most favorable to Torres, it suggested that Torres was held in custody after the preliminary hearing on June 10, 1994. *See Torres*, 1996 WL 680274, at *5. Such a

physical detention, we ruled, would be sufficient to constitute a "seizure" under the Fourth Amendment. *See id.* Conversely, we noted that if Torres had not, in fact, been detained following the preliminary hearing, he could not, as a matter of federal law, assert a § 1983 claim for malicious prosecution based on the preliminary hearing. *See id.*

According to Torres's response to defendants McLaughlin's and Sunderhauf's motion for summary judgment, he was released from police custody the same day he was arrested, June 3, 1994, after signing a bond, the terms of which included that he must:

(1) Appear before the issuing authority and in the Courts of the County of Philadelphia, Pennsylvania, at all times as his presence may be required, ordered or directed, until full and final disposition of the case, to plead, to answer and defend as ordered the aforesaid charge or charges.

(2) Submit himself to all orders and processes of the issuing authority or Court.

Certification of Bail and Discharge, at 2 (attached to Pl.'s Response to McLaughlin's and Sunderhauf's Mot. for Summ. J. at Exh. A (hereinafter "McLaughlin's Mot. for Summ. J. at ___")); *see* Pl.'s Response to McLaugh-

---

1. Defendants assert that they enjoy qualified immunity from suit because, after the Supreme Court's decision in *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), reasonable officials in their positions would not have known that maliciously prosecuting an innocent individual could give rise to a § 1983 action. *See* McLaughlin's and Sunderhauf's Mem. of Law in Support of Mot. for Summ. J. at 9 (hereinafter "McLaughlin Mem. of Law at ___").

It is true that, after *Albright*, which was decided on January 24, 1994, there was considerable uncertainty in this Circuit as to whether a malicious prosecution claim was actionable under § 1983. *See, e.g., Miller v. City of Philadelphia*, 954 F.Supp. 1056, 1065–66 (E.D.Pa.1997) (citing many cases on both sides of the issue). Our Court of Appeals, without discussing *Albright*, finally put this confusion to rest when it on July 31, 1996 decided *Hilfirty v. Shipman*, 91 F.3d 573 (3d Cir.1996), in favor of re-recognizing a malicious prosecution claim under § 1983, albeit now under the Fourth Amendment.

Notwithstanding defendants' claim, the case law in this Circuit prior to *Albright*, 510 U.S. at 270 n. 4, 114 S.Ct. at 811 n. 4 (the Supreme Court in *Albright* recognized that the Third Circuit had the most expansive view of malicious

prosecution claims) & *see infra* n. 7, coupled with the clear implication in *Albright* that a malicious implication claim may be asserted under the Fourth Amendment, *see Albright*, 510 U.S. at 273–75, 114 S.Ct. at 813 (Rehnquist, C.J., plurality opinion); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 115 n. 3 (2d Cir.1995), and the weight of federal authority post-*Albright*, *see, e.g., Smart v. Board of Trustees*, 34 F.3d 432, 434 (7th Cir. 1994), *cert. denied*, 513 U.S. 1129, 115 S.Ct. 941, 130 L.Ed.2d 885 (1995), leads us to the conclusion that, at the time of the incident at issue here—September 29, 1995, *see* Compl. at ¶ 14 (describing Torres's criminal trial)—malicious prosecution was a sufficiently established constitutional violation under § 1983 so as to deprive defendants McLaughlin and Sunderhauf of their assertions of qualified immunity. *See Miller*, 954 F.Supp. at 1066 (malicious prosecution was an established constitutional violation in the eighteen months prior to *Hilfirty*, which was decided in July of 1996); *see also Good v. Dauphin County Social Servs.*, 891 F.2d 1087, 1092 (3d Cir. 1989) ("The ultimate issue [when evaluating a claim of qualified immunity] is whether, despite the absence of a case applying established principles to the same facts, reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful.").

lin Mot. for Summ. J. at 11th unnumbered page. Because of the bond, Torres did not have to post any money for bail, which was set at five thousand dollars.

Torres then appeared in state court on June 10, 1994 (for a preliminary hearing where bail was continued),[2] April 13, 1995 (for a pretrial hearing), September 28, 1995 (when he pled not guilty to the charges), and, finally, September 29, 1995 (for his trial, where he was found guilty and immediately taken into custody). *See id.*

Neither Torres's signing of a bond on June 3, 1994, nor the June 10, 1994, preliminary hearing can, McLaughlin and Sunderhauf assert, serve as a factual predicate for a malicious prosecution claim because neither event constitutes a "seizure" under the Fourth Amendment. See McLaughlin Mem. of Law at 12–13. Torres responds that, while his prosecution was pending for close to fifteen months (from June 3, 1994, when he was released on bond, until his conviction and immediate incarceration on September 29, 1995), he "suffered restraints on his liberty which amounted to a Fourth Amendment violation." Pl.'s Response to McLaughlin's Mot. for Summ. J. at 12th unnumbered page.

The question raised in Torres's response, an issue of first impression in this Circuit, is whether Torres has a Fourth Amendment malicious prosecution claim based on the "restraints" he claims to have suffered while his criminal prosecution was pending.

Until the Supreme Court in *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), finally addressed the issue of malicious prosecution claims under § 1983, there had been an "embarrassing diversity of judicial opinion" as to whether such claims were actionable under § 1983. *Id.* at 271 n. 4, 114 S.Ct. at 811 n. 4 (citing *Brummett v. Camble*, 946 F.2d 1178, 1180 n. 2 (5th Cir.1991) (noting that the First, Fifth, and Sixth Circuits have "flip-flopped" on the constitutional tort status of malicious prosecution claims)).

The petitioner in *Albright* alleged that Detective Roger Oliver of the City of Macomb, Illinois had, under color of state authority, violated his right under the Due Process Clause of the Fourteenth Amendment to be free from prosecution except upon probable cause. *See Albright*, 510 U.S. at 267–71, 114 S.Ct. at 810–11 (Rehnquist, C.J., plurality opinion). In *Albright*, Detective Oliver had agreed to provide Veda Moore, a cocaine addict, with protection (from an unpaid and unhappy former cocaine supplier) and money in exchange for Moore's assistance in acting as a confidential informant, seeking out cocaine dealers and purchasing drugs from them with the money Oliver supplied. *See id.* at 292 n. 3, 114 S.Ct. at 823 n. 3 (Stevens & Blackmun, JJ., dissenting). Moore was singularly unsuccessful as an informant, having falsely implicated over fifty people in criminal activity, none of whom successfully prosecuted.

In the course of her work as an informant, Moore claimed that she had bought cocaine from John Albright, Jr. *See id.* at 268 n. 1, 114 S.Ct. at 810 n. 1 (Rehnquist, C.J., plurality opinion). The "cocaine" was, in fact, baking powder. Undeterred and without conducting any further investigation, Detective Oliver obtained a grand jury indictment against John Albright, Jr., for selling a "lookalike" substance, a crime in Illinois. *See id.* When he went to execute the search warrant, Detective Oliver discovered that John Albright, Jr. was a respected pharmacist in his sixties and clearly not the "dealer" of the baking soda. *See id.* Again undeterred, Detective Oliver, after learning that John Albright, Jr. had a son with the same first name, scratched out John Albright, Jr.'s name from the warrant and inserted that of John David Albright. *See id.* at 293 n. 4, 114 S.Ct. at 823 n. 4 (Stevens & Blackmun, JJ., dissenting). It immediately became obvious that John David Albright could not have sold the baking soda to Moore, either. *See id.* Detective Oliver, not one to give up easily, then asked Moore whether she could have purchased the baking soda from petitioner Kevin Albright. *See id.* Moore, not one

---

**2.** A bench warrant was issued on July 1, 1994, after Torres was ordered, but failed, to appear for his arraignment. *See id.*

much interested in the truth, agreed that Kevin Albright was indeed the seller of the baking soda. *See id.* Detective Oliver then secured an arrest warrant for Kevin Albright (his third and final suspect), who, upon learning of the felony warrant, voluntarily surrendered to Detective Oliver but maintained his innocence. *See id.* He was released after posting bond and agreeing not to leave the state without the court's permission.

At the preliminary hearing, Detective Oliver testified that Kevin Albright had sold a "look-alike" substance to Moore, leading the court to hold Kevin Albright over for trial. *See id.* at 267–69, 114 S.Ct. at 810 (Rehnquist, C.J., plurality opinion). At the preliminary hearing, however, the state court dismissed the charge on the ground that it did not state a cause of action under Illinois law. *See id.*

Kevin Albright then filed suit under § 1983, alleging that Detective Oliver had deprived him of his substantive due process right under the Fourteenth Amendment, specifically, his "liberty interest" to be free from criminal prosecution except upon probable cause. *See id.*

Judge Posner, writing for the Seventh Circuit panel, affirmed the district court's dismissal, holding that prosecution without probable cause is not a constitutional tort under the Due Process Clause of the Fourteenth Amendment actionable under § 1983, unless it is accompanied by incarceration, loss of employment, or some other form of palpable injury. *See Albright v. Oliver,* 975

F.2d 343 (7th Cir.1992). The Seventh Circuit found that, despite the shocking conduct of Detective Oliver, Kevin Albright had not suffered any of these constitutionally cognizable deprivations. *See id.* at 345 ("An arrest is a serious business. To arrest a person on the scanty grounds that are alleged to be all that Oliver had to go on is shocking.").

Chief Justice Rehnquist, writing for a plurality of the Court,[3] affirmed but on different grounds. *See Albright,* 510 U.S. at 267–69, 114 S. Ct. at 810 (O'Connor, Scalia, Ginsburg, JJ., joining in opinion). "Petitioner asks us to recognize a substantive right under the Due Process Clause of the Fourteenth Amendment to be free from criminal prosecution except upon probable cause. We decline to do so." *Id.* at 268, 114 S.Ct. at 810. Instead, Chief Justice Rehnquist identified a different constitutional source for Albright's malicious prosecution claim: the Fourth Amendment. *See Singer,* 63 F.3d at 115 n. 3. Because the Fourth Amendment addresses pretrial deprivations of liberty, and because the Court had previously recognized the Amendment's relevance to the liberty deprivations incident to criminal prosecutions, *see Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (Fourth Amendment requires a finding of probable cause prior to any extended pretrial deprivation of liberty after arrest), Chief Justice Rehnquist concluded that Albright should have brought his claim for malicious prosecution under the Fourth Amendment. *See Albright,* 510 U.S. at 273–75, 114 S.Ct. at 813.[4] The Chief

---

**3.** Chief Justice Rehnquist's plurality opinion was joined by Justices O'Connor, Scalia, and Ginsburg, each of whom in turn wrote their own concurring opinions as well. Justice Kennedy, who wrote an opinion which Justice Thomas joined, concurred in the judgment. Justices Stevens and Blackmun dissented.

As a result of this fractured ruling, *Albright* has proven to be a fertile ground for legal commentary. *See, e.g.,* John T. Ryan, Jr., *Malicious Prosecution Claims Under Section 1983: Do Citizens Have Federal Recourse?,* 64 Geo. Wash. L.Rev. 776 (April 1996); Kristin J. Brandon, *Taking the Tort Out of Constitutional Law: The "Constitutional Tort" of Malicious Prosecution,* 63 U. Cin. L.Rev. 1447 (Spring 1995); Michael T. Carton, Note, 25 Seton Hall L.Rev. 1560 (1995); Eric J. Wunsch, *Fourth Amendment and Fourteenth Amendment—Malicious Prosecution and § 1983: Is There a Constitutional Violation Remediable*

*Under Section 1983?,* 85 J.Crim. L. & Criminology 878 (Spring 1995); James Lank, *The Graham Doctrine as a Weapon Against Substantive Due Process,* 17 Harv. J.L. & Pub. Pol'y 918 (Summer 1994); Franklin G. Whittlesey, Casenote, *Fourth and Fourteenth Amendments—Substantive Due Process—Malicious Prosecution Does Not Constitute a Deprivation of Liberty Actionable as a Constitutional Tort Pursuant to the Due Process Clause,* 5 Seton Hall Const. L.J. 269 (1994).

**4.** "[W]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior," the Chief Justice reasoned, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Id.* at 273, 114 S.Ct. at 813 (internal quotation marks omitted); *see Singer,* 63 F.3d at 115 ("[T]he Court has always been

Justice went on, however, to "express no view as to whether [Albright's] claim would succeed under the Fourth Amendment, since he has not presented that question in his petition for certiorari." *Id.*

Given *Albright's* observation that the Fourth Amendment may be the proper basis for a malicious prosecution claim, the Second Circuit in *Singer v. Fulton County Sheriff,* 63 F.3d 110 (2d Cir.1995), suggested that "[t]he Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person—i.e., the right to be free of unreasonable or unwarranted restraints on personal liberty." *Id.* at 116.[5] A plaintiff like Mr. Torres, the Second Circuit reasoned, must therefore demonstrate a deprivation of liberty "consistent with the concept of 'seizure'." *Id.*

Neither the Supreme Court in *Albright* nor the Second Circuit in *Singer* nor any other post-*Albright* court of appeals as far as we can determine has described precisely what type of deprivation of liberty satisfies the requirement of constitutional injury for a § 1983 malicious prosecution claim to succeed. *See Leone v. Creighton,* 948 F.Supp. 192, 196 (E.D.N.Y.1996) (describing this area of the law as "relatively uncharted seizure waters").

Justice Ginsburg's concurrence in *Albright* suggests that someone in Torres's position suffers a "seizure" under the Fourth Amendment, even while not in physical custody, as long as the criminal charges against him remain pending. Justice Ginsburg wrote:

> reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended.") (citation and internal quotation marks omitted).

**5.** The Second Circuit in *Singer* did not, however, decide whether the plaintiff in that case had a viable Fourth Amendment malicious prosecution claim because of the deficiency in the district court's record regarding the nature and extent of plaintiff's pretrial seizure. *See* 63 F.3d at 117.

**6.** Justice Souter, in his concurrence, appeared to agree with Justice Ginsburg's view:

> There may indeed be exceptional cases where some quantum of harm occurs in the interim period after groundless criminal charges are filed but before any Fourth Amendment seizure. Whether any such unusual case may

A person facing serious criminal charges is hardly freed from the state's control upon his release from a police officer's physical grip. He is required to appear in court at the state's command. He is often subject, as in this case, to the condition that he seek formal permission from the court (at significant expense) before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction. Pending prosecution, his employment prospects may be diminished severely, he may suffer reputational harm, and he will experience the financial and emotional strain of preparing a defense.

*Albright,* 510 U.S. at 278, 114 S.Ct. at 815.

And while "[a] defendant incarcerated until trial no doubt suffers greater burdens," Justice Ginsburg opined that:

> That difference, however, should not lead to the conclusion that a defendant released pretrial is not still 'seized' in the constitutionally relevant sense. Such a defendant is scarcely at liberty; he remains apprehended, arrested in his movements, indeed 'seized' for trial, so long as he is bound to appear in court and answer the state's charges. He is equally bound to appear, and is hence 'seized' for trial, when the state employs the less strong-arm means of a summons in lieu of arrest to secure his presence in court.

*Id.* at 279, 114 S.Ct. at 815–16.[6]

By not requiring that the defendant be subject to any significant restrictions on

> reveal a substantial deprivation of liberty, and so justify a court in resting compensation on a want of government power or a limitation of it independent of the Fourth Amendment, are issues to be faced only when they arise. They do not arise in this case and I accordingly concur in the judgment of the Court.

*Id.* at 291, 114 S.Ct. at 822.

Justice Stevens, whose dissent Justice Blackmun joined, described a yet even broader view of the liberty interest protected under the Fourth Amendment:

> [T]he formal commencement of a criminal proceeding is quintessentially this type of state action. The initiation of a criminal prosecution, regardless of whether it prompts an arrest, immediately produces a wrenching disruption of everyday life. Every prosecution, like every arrest, is a public act that may seriously interfere with the defendant's liberty,

his liberty—such as travel restrictions or having to post bail—in order to state a § 1983 malicious prosecution claim, Justice Ginsburg's reasoning excises the constitutional element of a § 1983 claim. In effect,

> whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends. In short, an official accusation of serious crime has a direct impact on a range of identified liberty interests. That impact, moreover, is of sufficient magnitude to qualify as a deprivation of liberty meriting constitutional protection.
>
> *Id.* at 296, 114 S.Ct. at 824–25 (citations and internal quotation marks omitted); *see also id.* at 291 n. 3, 114 S.Ct. at 822 n. 3 (Souter, J., concurring) ("Justice Stevens argues that the fact that few of petitioner's injuries flowed *solely* from the filing of the charges against him does not make those injuries insubstantial, and maintains that the arbitrary filing of criminal charges may work substantial harm on liberty. While I do not quarrel with either proposition, neither of them addresses the threshold question whether the complaint alleges any substantial deprivation beyond the scope of what settled law recognizes at the present time." (internal citation and quotation marks omitted)).

7. Prior to *Albright*, most courts of appeals had found that the common law tort of malicious prosecution was actionable under § 1983, but had split with regard to the specific elements of the constitutional tort. Our Court of Appeals had taken the most expansive view: the elements of the constitutional tort of malicious prosecution claim were the same as the common law tort. *See Albright*, 510 U.S. at 270 n. 4, 114 S.Ct. at 811 n. 4 (citing *Lee v. Mihalich*, 847 F.2d 66, 69–70 (3d Cir.1988) ("[T]he elements of liability for the constitutional tort of malicious prosecution under § 1983 coincide with those of the common law tort.")); *see also Griffiths v. CIGNA Corp.*, 988 F.2d 457, 463 (3d Cir.), *cert. denied*, 510 U.S. 865, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993); *Lippay v. Christos*, 996 F.2d 1490, 1501 (3d Cir. 1993) ("We have recognized [a malicious prosecution claim under the due process clause] under section 1983, so long as the plaintiff proves the existence of the elements of the common law tort of malicious prosecution."); *Felker v. Christine*, 796 F.Supp. 135, 141 (M.D.Pa.), *aff'd*, 983 F.2d 1050 (3d Cir.1992).

By contrast, other courts of appeal had, even before *Albright*, taken the position that, in addition to the elements of the common law tort of malicious prosecution, a plaintiff needed to allege a deprivation of some provision of the Constitution in order to allege a § 1983 malicious prosecution claim. *See e.g., Usher v. City of Los Angeles*, 828 F.2d 556, 562 (9th Cir.1987); *Kohl v. Casson*, 5 F.3d 1141, 1145 (8th Cir.1993) ("[M]alicious prosecution, without more, does

every state law claim for false arrest or malicious prosecution would, without more, also state a claim under § 1983. *See Niemann v. Whalen*, 911 F.Supp. 656, 670–71 (S.D.N.Y.1996); *Williams v. Weber*, 905 F.Supp. 1502, 1511–12 (D.Kan.1995).[7]

not state a claim under 42 U.S.C. § 1983."); *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1432 (10th Cir.1984) ("Malicious prosecution does not automatically constitute a denial of due process."), *cert. denied*, 474 U.S. 818, 106 S.Ct. 65, 88 L.Ed.2d 53 (1985).

*Albright*, we believe, has effectively overturned our Court of Appeals's expansive view, which had been expressed under a regime where malicious prosecution claims were actionable under § 1983 based upon the Fourteenth Amendment's substantive due process jurisprudence. See 510 U.S. at 273–75, 114 S.Ct. at 813 (Rehnquist, C.J., plurality opinion) (need for clear constitutional guideposts). It is clear that *Albright* requires that a plaintiff base a malicious prosecution claim on the Fourth Amendment, *see supra* n. 4, and thus show, in addition to the elements of the common law tort of malicious prosecution, some deprivation of liberty that rises to the level of a Fourth Amendment "seizure" in order for a state law claim to succeed as a federal one. *See Albright*, 510 U.S. at 273–75, 114 S.Ct. at 813; *Singer*, 63 F.3d at 117.

Requiring that there be a constitutionally-cognizable deprivation of liberty is consistent with the purpose of § 1983. Although a § 1983 malicious prosecution claim closely parallels its common law analogue, an award of damages under § 1983 is meant to compensate for a *constitutional* deprivation, *see Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986); *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), and, thus, a § 1983 claim of malicious prosecution must be measured, after *Albright*, against the standards of the Fourth Amendment.

Consequently, we find that after *Albright*, contrary to our Court of Appeals's overtaken holding in *Lee*, not all official acts that are actionable under a state law malicious prosecution claim are necessarily actionable under § 1983. *See Albright*, 975 F.2d at 346 ("[T]he courts have declined to equate every infringement of an interest protected at common law to a deprivation of a constitutionally protected liberty." (citing cases)); *see also Garner v. Township of Wrightstown*, 819 F.Supp. 435, 445 (E.D.Pa.) ("Thus, strictly speaking, it is incorrect to talk about a malicious prosecution ... action premised solely on state tort elements. Rather, what must be identified in every § 1983 case, including [a malicious prosecution claim], is the constitutional provision allegedly violated." (quoting S. Nahmod, *Civil Rights and Civil Liberties Litigation*

Such an outcome would be contrary to what the Supreme Court has repeatedly noted as the purpose of § 1983: to create "a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the *Constitution.*" *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 305–06, 106 S.Ct. 2537, 2542, 91 L.Ed.2d 249 (1986) (internal quotation marks omitted and emphasis added) (citing cases). Thus, while the "appropriate starting point" of the inquiry is the common law of torts, *Carey v. Piphus,* 435 U.S. 247, 253, 98 S.Ct. 1042, 1046–47, 55 L.Ed.2d 252 (1978), the Supreme Court has held that the "[t]he validity of the claim must [still] be judged by reference to the specific constitutional standard which governs that right...." *Graham v. M.S. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989); *see Stachura,* 477 U.S. at 307, 106 S.Ct. at 2543 (" '[T]he basic purpose' of § 1983 damages is 'to compensate persons for injuries that are caused by the deprivation of *constitutional rights.*' ") (emphasis deleted and added) (quoting *Carey,* 435 U.S. at 254, 98 S.Ct. at 1047).

Justice Ginsburg's concurrence is also contrary to the Supreme Court's holding in *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863–64, 43 L.Ed.2d 54 (1975). In *Gerstein,* while recognizing that the conditions attached to a criminal defendant's pretrial release may be so burdensome as to effect a significant restraint on liberty, the Court held that ordinarily the Fourth Amendment requires a probable cause determination for the commencing of criminal charges only when a defendant suffers extended restraints

on his liberty other than merely having to appear for trial. *Id.* at 125 n. 26, 95 S.Ct. at 869 n. 26.[8] Justice Ginsburg's concurrence, in contrast, suggests that merely requiring a defendant to appear before a court for hearings or trial, standing alone, constitutes a deprivation of liberty of sufficient constitutional injury. *See Niemann,* 911 F.Supp. at 670; *Williams,* 905 F.Supp. at 1511–12.

Finally, Justice Ginsburg's concurrence would do away with the common law distinctions between the torts of false arrest and malicious prosecution:

> Albright's presentations essentially carve up the officer's conduct, though all part of a single scheme, so that the actions complained of match common law tort categories: first, false arrest (Fourth Amendment's domain); next, malicious prosecution (Fifth Amendment territory). In my view, the constitutional tort 42 U.S.C. S 1983 authorizes stands on its own, influenced by the substance, but not tied to the formal categories and procedures, of the common law. According the Fourth Amendment full sway, I would not force *Albright's* case into a different mold.

*Albright,* 510 U.S. at 277 n. 1, 114 S.Ct. at 815 n. 1 (Ginsburg, J., concurring); *see also Williams,* 905 F.Supp. at 1512 n. 12.[9]

Justice Ginsburg's reasoning in this regard is also contrary to the Supreme Court's holding in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), where the Court acknowledged the difference between the torts of false arrest and malicious prosecution. In examining the proper relationship

---

§ 3.15 (3d ed.1991))), *aff'd,* 16 F.3d 403 (3d Cir.1993).

**8.** There exists a wide range of opinion amongst the circuits as to how long a person may be detained without a determination of probable cause. *Compare Williams v. Ward,* 845 F.2d 374 (2d Cir.1988) (finding a 72 hour detention prior to a probable cause hearing to be unconstitutional), *cert. denied,* 488 U.S. 1020, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989), *with Bernard v. City of Palo Alto,* 699 F.2d 1023 (9th Cir.1983) (holding that a probable cause hearing must occur within 24 hours of arrest).

**9.** In general, allegations that a warrantless arrest was not supported by probable cause advance the common law claim of false arrest, which

allows an aggrieved person to recover damages from the time of detention up until the issue of process or arraignment. *See Torres,* 1996 WL 680274, at *4.

"By contrast, allegations seeking damages for an arrest made pursuant to an arrest warrant that was not supported by probable cause, or for the period after legal process was initiated, are analogous to the common law tort to malicious prosecution," which allows a successful plaintiff to recover damages for the time period after post-arraignment arrest or imprisonment. *Id.* (canvassing at length the difference between the common law torts of malicious prosecution and false arrest).

between § 1983 and *habeas corpus* proceedings, the Court in *Heck* held that a convicted criminal defendant may only bring a § 1983 action if he pleads and proves the unlawfulness of his conviction or confinement. *Id.* at 482–83, 114 S.Ct. at 2370. In explaining its holding, the Court stated that the common law tort of malicious prosecution provided the closest analogy to the claim at issue there, since "unlike the related cause of action for false arrest or imprisonment, [a malicious prosecution claim] permits damages for confinement imposed pursuant to legal process." *Id.* at 484, 114 S.Ct. at 2371.

 Furthermore, if Justice Ginsburg's suggestion is heeded and the Fourth Amendment is given "full sway" so that plaintiffs no longer need to fit their claims into the molds

of the common law torts, then the extensive body of federal case law defining when the appropriate statute of limitations is triggered would be abandoned.[10]

Although no Justice expressed any disagreement with Justice Ginsburg's view that a party is "seized" in a constitutional sense for so long as a prosecution is pending, *see supra* n. 6,[11] district courts that have grappled with the issue have not viewed her concurrence favorably. *See, e.g., Maldonado v. Pharo*, 940 F.Supp. 51 (S.D.N.Y.1996); *Niemann v. Whalen*, 911 F.Supp. 656 (S.D.N.Y.1996); *Subirats v. D'Angelo*, 938 F.Supp. 143 (E.D.N.Y.1996); *Williams v. Weber*, 905 F.Supp. 1502 (D.Kan.1995).[12]

In sum, given (1) Chief Justice Rehnquist's express disclaimer in the plurality opinion

**10.** Although Congress has never enacted a specific statute of limitations for §§ 1983 or 1985, the Supreme Court in *Wilson v. Garcia*, 471 U.S. 261, 276, 280, 105 S.Ct. 1938, 1947, 1949, 85 L.Ed.2d 254 (1985), held, as a matter of federal law, that for § 1983 actions the courts should "borrow" the state statute of limitations period applicable to personal injury torts. *See Springfield Township Sch. Dist. v. Knoll*, 471 U.S. 288, 105 S.Ct. 2065, 2065, 85 L.Ed.2d 275 (1985) ("[A]ll § 1983 claims should be characterized for statute of limitations purposes as actions to recover damages for injuries to the person."). It is well-established that though the applicable limitations period governing personal injury actions is borrowed from the law of the forum state, federal law supplies the applicable accrual rule. *See Albright*, 510 U.S. at 280 n. 6, 114 S.Ct. at 816 n. 6 (Ginsburg, J., concurring).

It is equally well established that the statute of limitations period for § 1983 claims "begins to run from the time when the plaintiff knows or has reason to know of the injury which is the basis of the section 1983 action." *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 919 (3d Cir. 1991) (citation omitted); *see Deary v. Three Un-Named Police Officers*, 746 F.2d 185, 193 (3d Cir.1984); *Sandutch v. Muroski*, 684 F.2d 252, 254 (3d Cir.1982) (per curiam). In order to determine when a plaintiff knew or had reason to know of the alleged constitutional tort, we look to the common law cause of action most closely analogous to the constitutional right allegedly infringed. *See Heck*, 512 U.S. at 483–85, 114 S.Ct. at 2371; *Albright*, 510 U.S. at 269–71, 114 S.Ct. at 811.

Consequently, a § 1983 claim for false arrest accrues on the date of the plaintiff's arrest. *See Rose v. Bartle*, 871 F.2d 331, 348–51 (3d Cir. 1989); *Deary*, 746 F.2d at 197 n. 16; *Hamidian v. Occulto*, 854 F.Supp. 350, 353 (M.D.Pa.1994); *Cunnane v. Subers*, No. 92–4844, 1993 WL 21217, at *2 (E.D.Pa. Jan.26, 1993), while a

malicious prosecution claim does not accrue until a favorable termination is obtained. *See Rose*, 871 F.2d at 349; *see also supra* n. 9.

Under Justice Ginsburg's approach, by contrast, the statute of limitations for all claims (false arrest and malicious prosecution) would be triggered only once the criminal defendant has obtained a favorable disposition of his case. *Albright*, 510 U.S. at 279–81, 114 S.Ct. at 816 (Ginsburg, J., concurring).

**11.** Justice Scalia, who wrote a brief concurring opinion joining Chief Justice Rehnquist's plurality opinion, did not address Justice Ginsburg's view of the Fourth Amendment. Justice Kennedy, who concurred in the judgment and was joined in his opinion by Justice Thomas, also did not address the issues Justice Ginsburg raised.

**12.** The only other court in our Circuit that has addressed Justice Ginsburg's concurrence in *Albright* found that "Justice Ginsburg's opinion acknowledges that a defendant need not be kept in physical custody to be seized by the state. However, she does not in any way suggest that there are any acts which constitute a seizure by a law enforcement individual, such as testimony at a preliminary hearing, separate from the initial act by which the state seizes control over the defendant in order to carry out legal proceedings." *Patterson v. Board of Probation and Parole*, 851 F.Supp. 194, 200 (E.D.Pa.1994). We disagree with our colleague. Justice Ginsburg, we believe, in fact meant to suggest that, for example, requiring a defendant to appear and testify at a preliminary hearing constitutes a seizure under the Fourth Amendment sufficient to state a § 1983 malicious prosecution claim. Rather than gloss over the ramifications of Justice Ginsburg's concurrence, we have chosen instead to address them in the hope of shedding light on this issue.

that "[w]e express no view as to whether petitioner's claim would succeed under the Fourth Amendment," *Albright*, 510 U.S. at 275, 114 S.Ct. at 813, (2) Justice Ginsburg's view that a person is "seized" in the constitutional sense "so long as he is bound to appear in court and answer the state's charges," *id.* at 279, 114 S.Ct. at 816, (3) Justice Souter's apparently favorable assessment of Justice Ginsburg's view, *see id.* at 290–92, 114 S.Ct. at 822 & *supra* n. 6, and (4) Justices Stevens's and Blackmun's dissent, articulating a broad concept of "liberty" under the Fourth Amendment, *see Albright*, 510 U.S. at 292–98, 114 S.Ct. at 823–25 & *supra* n. 6, federal district courts have had little, if no, clear guidance as to what constitutes a deprivation of liberty sufficient to support a § 1983 malicious prosecution claim.

Courts that have addressed the issue generally have observed that, while

> every person who is the victim of an unlawful prosecution must spend time, money and emotional resources preparing a defense. Clearly, every person subject to an unlawful prosecution faces the possibility of reputational harm

*Niemann*, 911 F.Supp. at 670, these types of deprivations simply do not qualify as a deprivation of liberty meriting Fourth Amendment protection. *See Albright*, 975 F.2d at 346.

■ Having to appear in state court for his preliminary hearings, arraignment and trial were the only "restraints" on Torres's liberty. Torres in this case did not have to post any money bail to be released on the day he was arrested, June 3, 1994, nor on any subsequent date, nor was he prohibited from traveling outside of the Commonwealth under the conditions of his bond. *See Albright*, 975 F.2d at 346. Absent any constitutionally-significant pretrial restraints on Torres's liberty, the weight of federal authority (at least as it stands today) holds that Torres may not maintain a § 1983 claim for malicious prosecution based on the pre-incarceration time period. *See Johnson v. City of New York*, 940 F.Supp. 631, 635 (S.D.N.Y. 1996) (plaintiff who was "released immediately following his appearance" before the arraignment judge could not assert a malicious

prosecution claim under the Fourth Amendment); *Leone*, 948 F.Supp. at 195 (a criminal defendant who was subjected to a "baseless charge of harassment" does not state a Fourth Amendment violation); *Niemann*, 911 F.Supp. at 656 (plaintiff who was not subject to travel restrictions and did not have to post bail was not "seized" in her person); *Subirats*, 938 F.Supp. at 149 (holding that incurring legal expenses in defending a criminal prosecution is not a sufficient constraint under the Fourth Amendment to sustain a § 1983 malicious prosecution claim); *Maldonado*, 940 F.Supp. at 54 (finding that an order to return to court and "psychological trauma allegedly suffered as a result of [having] the charges pending" did not constitute the requisite constitutional injury); *Williams*, 905 F.Supp. at 1512 (holding that plaintiff's complaint that "the malicious filing of criminal charges subjected him to financial and emotional burdens in mounting a legal defense and required him to stand trial for two days" is not a sufficient deprivation of liberty under the Fourth Amendment).

■ We find that, based on the weight of this developing federal case law, neither the preliminary hearing of June 3, 1994, nor anything in the prosecution of the criminal case against Torres before his incarceration on September 29, 1995, can serve as the factual predicate for his malicious prosecution claim. Conversely, Torres's incarceration from September 29, 1995, until his release on May 13, 1996, is certainly a cognizable deprivation of liberty under the Fourth Amendment that can serve as the basis for Torres's § 1983 malicious prosecution claim. Because there is a constitutional ground for Torres's malicious prosecution claim, we now turn to the common-law elements of that claim.

### 2. *Common-Law Elements of Malicious Prosecution*

■ Under Pennsylvania law, in order to prevail on a malicious prosecution claim, a plaintiff must prove that the defendant (1) instituted the proceedings, (2) without probable cause, (3) with actual malice, and (4) that the proceedings terminated in favor of the plaintiff. *See Griffiths v. CIGNA Corp.*, 988

F.2d 457, 463 (3d Cir.), *cert. denied,* 510 U.S. 865, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993); *Kelley v. General Teamsters, Local Union 249,* 518 Pa. 517, 544 A.2d 940, 941 (1988).

Defendants contend that Torres cannot make out the common law elements of a malicious prosecution claim because (a) Officer McLaughlin did not initiate Torres's prosecution; (b) the jury's finding of guilt against Torres, on September 29, 1995, conclusively establishes that the prosecution did not lack probable cause; and (c) the proceedings against Torres did not terminate in his favor. We shall discuss each contention *seriatim.*

### a. *Initiation of the Prosecution*

Our Court of Appeals has instructed that one's responsibility for the initiation of criminal proceedings element of a malicious prosecution claim is determined by reference to § 653, comment g, of the Restatement (Second) of Torts. The Restatement distinguishes between cases where someone files a complaint or demands a prosecution, and scenarios in which someone merely provides information to the police.

 In the first category, one is liable for malicious prosecution if one "fail[s] to disclose exculpatory evidence to prosecutors, make[s] false or misleading reports to the prosecutor, omit[s] material information from the reports, or otherwise interfere[s] with the prosecutor's ability to exercise independent judgment." *Rhodes v. Smithers,* 939 F.Supp. 1256, 1273 (S.D.W.Va.1995) (citing many cases), *aff'd,* 91 F.3d 132 (4th Cir.1996); Restatement (Second) of Torts § 653 cmt. g ("If, however, the information is known by the giver to be false, an intelligent exercise of the officer's discretion becomes impossible, and a prosecution based upon it is procured by the person giving the false information. In order to charge a private person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false.").

 By contrast, a police officer or private citizen "who does not knowingly provide false information is not responsible for the institution of proceedings, and thus cannot be held liable for malicious prosecution as he need not have had a reasonable basis for making the accusation." *Griffiths,* 988 F.2d at 464; *see Rhodes,* 939 F.Supp. at 1274 ("[W]here an officer presents all relevant probable cause evidence to an intermediary, such as a prosecutor, a grand jury, or a magistrate, the intermediary's independent decision to seek a warrant, issue a warrant, or return an indictment breaks the causal chain and insulates the officer from a section 1983 [malicious prosecution] claim .…" (citing many cases)); Restatement (Second) of Torts § 653 cmt. g ("A private person who gives to a public official information of another's supposed criminal misconduct, of which the official is ignorant, obviously causes the institution of such subsequent proceedings as the official may begin on his own initiative, but giving the information or even making an accusation of criminal misconduct does not constitute a procurement of the proceedings initiated by the officer if it is left entirely to his discretion to initiate the proceedings or not. When a private person gives to a prosecuting officer information that he believes to be true, and the officer in the exercise of his uncontrolled discretion initiates criminal proceedings based upon that information, the informer is not liable … even though the information proves to be false and his belief was one that a reasonable man would not entertain. The exercise of the officer's discretion makes the initiation of the prosecution his own and protects from liability the person whose information or accusation has led the officer to initiate the proceedings."); *see also Smith v. Gonzales,* 459 U.S. 1005, 103 S.Ct. 361, 74 L.Ed.2d 397 (1982) (White, J., dissenting), *denying cert. to* 670 F.2d 522 (5th Cir.).

 We find that, drawing all reasonable inferences in Torres's favor, plaintiff has sufficient evidence to permit a reasonable jury to conclude that Officer McLaughlin may have made false statements to the prosecutor in Torres's criminal case, such that Officer

McLaughlin may be charged with the initiation of the criminal proceeding.

It is a fact that the Commonwealth agreed to release Torres from prison on May 13, 1996, where after his conviction he had served only seven and a half months of his thirty-six to seventy-two month sentence. John Gorman, Torres's defense counsel in the criminal case, stated in his deposition in this case that he had information that a Mr. Gross, from the District Attorney's Office, informed the Philadelphia Defender's Association that "We should go see Judge Brinkley as soon as possible. If there is a possibility that this man [referring to Torres] is being unjustly incarcerated he should not spend another day in jail." Deposition of John Gorman, Esquire, at 9 (attached to McLaughlin's Mem. of Law at Exh. 4).

As result, Mr. Gorman on May 10, 1996, appeared before Judge Genece E. Brinkley and moved for a new trial and Torres's immediate release. *See* May 10, 1996 Hrg. Tr. at 3–4 (attached to Pl.'s Response to McLaughlin's Mot. for Summ. J. at Exh. C). Mr. Gross, representing the Commonwealth, readily agreed:

> MR. GROSS: Your Honor, the Commonwealth does not oppose the defendant's motion, insofar as it requests a Motion for New Trial. The motion is titled, at least as it was originally filed, 'Post Sentence Motion for Judgment of Acquittal, Motion in Arrest of Judgment, or, in the alternative, Motion for New Trial, In the Interests of Justice.'
>
> *If Your Honor grants the motion for a new trial, we would immediately move to nolle pros the charges, and it would be appropriate for your Honor to order the defendant be released today.*
>
> Your Honor, we certainly do not concede all the allegations made in the petition. We conducted our own review of the case, and, based on information that has come to light since the defendant's sentencing, we

will state to the court, in the interests of justice, *we would agree to granting of a new trial. and as I stated, immediately move to nolle pros.*

> THE COURT: I'm granting the motion for a new trial. Do you have a subsequent motion?
>
> MR. GROSS: The Commonwealth moves to nolle pros all charges, in the interests of justice.
>
> THE COURT: Motion for nolle pros granted.

Hrg. Tr. at 5 (emphasis added).[13]

 First Assistant District Attorney Arnold Gordon explained during a preliminary hearing in an unrelated criminal case why he had moved for a *nolle prosequi* in fifty-three pending criminal cases and the *closed* case against Torres:

> We turned over as part of discovery … information which one could characterize as indicating that BNI Agent McLaughlin may have lied in a search warrant.... [W]e choose to nol-pros all remaining open cases in which Officer McLaughlin was the necessary or essential or important witness.
>
> . . . .
>
> [T]he reason for nol-prossing these fifty-three cases was because Officer McLaughlin did something which one could characterize as lying in a search warrant.... [W]e chose not [to put McLaughlin on the stand] solely because of what had occurred with regard to that one search warrant....

Nov. 2, 1996 Hrg. Tr. at 13–14, 22–23 (attached to Pl.'s Response to McLaughlin's Mot. for Summ. J. at Exh. E); *see* McLaughlin's Mem. of Law at 18–19, 22–23; Affidavit of Arnold Gordon, Esquire, at 1 ("In my capacity as First Assistant District Attorney, I reviewed the criminal case against Felix Torres.... The decision was made to nolle

---

13. Judge Brinkley, on May 13, 1996, signed the following order:

AND NOW, this 13th day of May, 1996, it is hereby ORDERED AND DECREED:

That petitioner's Motion for A New Trial is granted;

That petitioner's sentence is vacated;

That the prosecution's motion to nolle prosse all charges is granted;

That all charges are dismissed; and

That Felix Torres is to be released forthwith. May 13, 1996 Order (attached to Pl.'s Response to McLaughlin's Mot. for Summ. J. at Exh. B).

pros this case because BNI agent John McLaughlin was an essential witness in the case.") (attached to Pl.'s Response to McLaughlin's Mot. for Summ. J. at Exh. D).[14]

Notwithstanding Mr. Gordon's benign characterization of the Commonwealth's actions, drawing all reasonable inferences in Torres's favor, it is clear from the totality of the circumstances that the Commonwealth, in fact, did more than merely agree that Judge Brinkley should enter a *nolle prosequi* in Torres's criminal case. Torres has proffered sufficient competent evidence to suggest that, once the Commonwealth realized that Torres was innocent and languishing in prison because of Officer McLaughlin's mendacity, it immediately sought a court hearing, where it readily agreed to Torres's motion for a new trial and then instantly agreed to an entry of a *nolle prosequi*.

Our characterization of the events that occurred before the entry of the *nolle prosequi* here are confirmed by the statements Judge Brinkley made at the May 10, 1996 hearing. Judge Brinkley, who had presided over Torres's criminal trial and sentenced him, recalled that, at the time of sentencing, she remarked that "if there ever were a case where I think a person should not be in jail, it would be this one. So this is the right result." May 10, 1996 Hrg. Tr. at 4 (attached to Pl.'s Response to McLaughlin's Mot. for Summ. J. at Exh. C).[15]

We find, in sum, that Torres has sufficiently satisfied this common-law element of a malicious prosecution claim to survive a motion for summary judgment.

### b. *Probable Cause*

Next, defendants seek to dismiss Torres's claim on the ground that Torres's conviction by a jury, on September 29, 1995, conclusively establishes that there was probable cause to bring the criminal proceeding against Torres. *See* McLaughlin's Mem. of Law at 23 (citing *Crescent City Live Stock Co. v. Butchers' Union Slaughter House Co.*, 120 U.S. 141, 150–51, 7 S.Ct. 472, 476–77, 30 L.Ed. 614 (1887)).

■ Generally, issue preclusion bars the relitigation of issues fully adjudicated in a prior legal proceeding. Because a plaintiff in a malicious prosecution action must show that the underlying criminal proceeding terminated in his favor—specifically, that there was a lack of probable cause to bring the proceeding, *see Lee*, 847 F.2d at 69–70—a criminal conviction in state court will ordinarily preclude a criminal defendant from asserting a malicious prosecution claim. *See Mosley v. Wilson*, 102 F.3d 85, 91 (3d Cir. 1996); *see also infra* n. 21. Indeed, the Restatement (Second) of Torts instructs that a conviction, even if later overturned, "conclusively establish[es] the existence of probable cause, unless the conviction was obtained by fraud, perjury or other corrupt means."

**14.** Torres, in his answers to interrogatories, lists eleven cases, in which, according to Torres, both state and federal courts have found Officer McLaughlin's testimony to be false or where Officer McLaughlin was "caught" lying in search warrants. See Pl.'s Answers to Second Set of Interrogatories at ¶¶ 3–5 (attached to Pl.'s Response to McLaughlin's Mot. for Summ. J. at Exh. F).

It is well-established that malice is an essential element of a malicious prosecution claim. *See City of Erie v. Guaranty Nat'l Ins. Co.*, 109 F.3d 156, 161 (3d Cir.1997); W. Page Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 119, at 881 (5th ed.1984) (plaintiff must prove the absence of probable cause for the proceeding, as well as malice: a "primary purpose other than [that of] bringing an offender to justice"); 8 S. Speiser, C. Krause & A. Gans, *American Law of Torts* § 28:7, at 38 & § 28:11, at 61 (1991).

Although Federal Rule of Evidence 404(b) prohibits the introduction of "evidence of other crimes, wrongs, or acts ... to prove the character of a person in order to show action in conformity therewith," the Rule allows for the admission of such evidence to show, among other elements, motive and intent. Thus, while we certainly would not allow Torres to conduct eleven separate trials to establish that Officer McLaughlin lied in other criminal cases, see Fed. R.Evid. 403, Torres may introduce as evidence, in order to establish a malicious intent on the part of Officer McLaughlin, the *fact* (if true) that Officer McLaughlin was found to have lied in other criminal cases.

**15.** In fact, according to Mr. Gorman, Judge Brinkley wanted to see Torres after his release and "[s]o she called Sheriff Green and had [Torres] brought down on the 13th [of May], and basically re-did the whole thing all over again in [Torres's] presence ..." Gorman Dep. at 6–7.

*Id.* at § 667(1) (cited in *Mosley,* 102 F.3d at 91).

There is, however, "a considerable minority view which regards the conviction as creating only a presumption, which may be rebutted by *any* competent evidence showing that the probable cause for the prosecution did not in fact exist." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts,* § 119, at 882 (5th ed.1984) (emphasis added) (cited in *Mosley,* 102 F.3d at 91).

Our Court of Appeals has recognized that, when a conviction is later overturned, "[t]he courts appear to be divided on the preclusive effect that the initial conviction should have on the issues of probable cause for the arrest and/or prosecution in a subsequent action for malicious prosecution brought against the police or municipal authorities." *Mosley,* 102 F.3d at 91; *see also generally Haddock v. Christos,* 866 F.Supp. 170, 173–77 (M.D.Pa. 1994).

The Supreme Court recognized this split in authority in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). In his opinion concurring in the judgment,[16] Justice Souter noted that, under Reconstruction-era common law, a conviction was regarded as irrefutable evidence that probable cause was *not* lacking. *Id.* at 495–96, 114 S.Ct. at 2377 (citing T. Cooley, *Law of Torts* 185 (1879) ("If the defendant is convicted in the first instance and appeals, and is acquitted in the appellate court, the conviction below is conclusive of probable cause.")). Although Justice Souter acknowledged a "liberalization" of this common-law requirement "over the years," *Heck,* 512 U.S. at 496 n. 3, 114 S.Ct. at 2377 n. 3, he argued for adherence to the Reconstruction-era understanding of the common-law rule. *See id.* at 496, 114 S.Ct. at 2377 ("[C]onviction of a crime wipes out a person's § 1983 claim for damages for unconstitutional conviction or post-conviction confinement.").

Justice Scalia, in response, took a more liberal approach:

Chief Justice Cooley no doubt intended merely to set forth the general rule that a conviction defeated the malicious prosecution plaintiff's allegation (essential to his cause of action) that the prior proceeding was without probable cause. But this was not an absolute rule in all jurisdictions, and early on it was recognized that there must be exceptions to the rule in cases involving circumstances such as fraud, perjury or mistake of law. Some cases even held that a conviction, although it be afterwards reversed, is *prima facie* evidence—and that only—of the existence of probable cause. In *Crescent City Live Stock Co. v. Butchers' Union Slaughter–House Co.,* 120 U.S. 141 [7 S.Ct. 472, 30 L.Ed. 614] (1887), we recognized that '[h]ow much weight as proof of probable cause shall be attributed to the judgment of the court in the original action, when subsequently reversed for error, may admit of some question.' *Id.* at 149 [7 S.Ct. at 476].... [O]ur discussion [in *Crescent*] well establishes that the absolute rule Justice Souter contends for did not exist.

*Heck,* 512 U.S. at 484 n. 4, 114 S.Ct. at 2371 n. 4 (citations and internal quotation marks omitted).[17]

Justice Scalia, the author of the majority opinion in *Heck,* wrote in conclusion that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." *Id.* at 486–87, 114 S.Ct. at 2372.[18]

**16.** Justices Blackmun, Stevens, and O'Connor joined in Justice Souter's opinion.

**17.** *See, e.g., Brandley v. Keeshan,* 64 F.3d 196, 199 (5th Cir.1995) ("Even a prosecutor's failure to act on remand will at some point entitle a defendant to an order of dismissal. However, the reversal of a conviction and remand for new trial is not, in and of itself, a termination.") (footnote omitted), *cert. denied,* ––– U.S. –––, 116 S.Ct. 947, 133 L.Ed.2d 872 (1996).

**18.** "This requirement avoids parallel litigation over the issues of probable cause and guilt ... and it precludes the possibility of the claimant succeeding in the tort action after having been

The contradiction in the authorities Justices Souter and Scalia describe from the Reconstruction-era common law continue to exist in modern day Pennsylvania law. *Compare Cosmas v. Bloomingdales Bros., Inc.*, 442 Pa.Super. 476, 660 A.2d 83, 86 (1995) (stating that a conviction even if overturned is conclusive proof of the existence of probable cause unless the party can show undue influence at work in the conviction proceedings), *with Cap v. K–Mart Discount Stores, Inc.*, 357 Pa.Super. 9, 515 A.2d 52, 53 (1986) (holding that a conviction by the justice of peace reversed on appeal does not preclude action for malicious prosecution even without undue influence in the proceedings).

Our Court of Appeals in *Mosley* sought to reconcile Pennsylvania state court case law.

convicted in the underlying criminal prosecution...." *Id.* at 484, 114 S.Ct. at 2371 (citations omitted). "[T]o permit a convicted criminal defendant to proceed with a malicious prosecution claim would permit a collateral attack on the conviction through the vehicle of a civil suit." *Id.; see Smithart v. Towery*, 79 F.3d 951, 952 (9th Cir.1996) ("*Heck* ... says that if a criminal conviction arising out of the same facts stands and is fundamentally inconsistent with the unlawful behavior for which section 1983 damages are sought, the 1983 action must be dismissed."); *see also Cameron v. Fogarty*, 806 F.2d 380, 387 (2d Cir.1986) ("[T]he common-law rule, equally applicable to actions asserting false arrest, false imprisonment, or malicious prosecution, was and is that the plaintiff can under no circumstances recover if he was convicted of the offense for which he was arrested."), *cert. denied*, 481 U.S. 1016, 107 S.Ct. 1894, 95 L.Ed.2d 501 (1987); *infra* n. 21.

"When a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Heck*, 512 U.S. at 487, 114 S.Ct. at 2372–73 (footnotes omitted).

An example of an action "whose successful prosecution would necessarily imply that the plaintiff's criminal conviction was wrongful," *id.* at 487 n. 6, 114 S.Ct. at 2373 n. 6, is one brought by a defendant convicted of, and sentenced for, a crime of resisting arrest against the arresting officer asserting a Fourth Amendment violation,

In *Mosley*, the Pennsylvania Supreme Court had earlier reversed the defendant's criminal conviction because of its concern that his trial was tainted when a juror, who later served as foreman of the jury, had an extensive *ex parte* conversation with one of the Commonwealth's police trial witnesses. *See* 102 F.3d at 93. The Pennsylvania Supreme Court concluded that:

> We ... cannot say with any degree of certainty that the contact did not establish a rapport, albeit unconscious, between [the police witness] and the jury foreman which in some way influenced the outcome of the trial.

*Id.* Our Court of Appeals explained this holding as follows:

because success in the action would necessarily negate an element of the offense of which the plaintiff has been convicted. *See id.*

By contrast, an example of an action that would not necessarily imply the unlawfulness of a plaintiff's conviction is a damage action alleging an unreasonable search even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the plaintiff's conviction, see *id.* at n. 7, "[b]ecause of doctrines like independent source and inevitable discovery, and especially harmless error, such a § 1983 action, even if successful, would not necessarily imply that the plaintiff's conviction was unlawful." *Id.* (citations omitted). *But compare Simpson v. Rowan*, 73 F.3d 134, 136 (7th Cir. 1995) (holding that *Heck* does not foreclose plaintiff's claims relating to illegal search and improper arrest, because, if successful, they would not necessarily undermine convictions), *cert. denied*, —— U.S. ——, 117 S.Ct. 104, 136 L.Ed.2d 58 (1996), *with Schilling v. White*, 58 F.3d 1081, 1086 (6th Cir.1995) ("The fact that a Fourth Amendment violation may not necessarily cause an illegal conviction does not lessen the requirement [*under Heck*] that a plaintiff show that a conviction was invalid as an element of constitutional injury.").

As we discussed in Part II.A.1, *supra*, it is clear that Torres's claim is a suit for malicious prosecution arising out of his incarceration following his criminal conviction. This claim necessarily implies that Torres's conviction was unlawful. Accordingly, this suit for damages can succeed only if the prosecution ultimately fails, that is, only if the conviction is held to be unlawful. *See Antonelli v. Foster*, 104 F.3d 899, 900 (7th Cir. 1997). Thus, it is equally clear that *Heck's* holding applies to Torres's claim. *Cf. Booker v. Ward*, 94 F.3d 1052, 1056 (7th Cir.1996) (citing cases), *cert. denied*, —— U.S. ——, 117 S.Ct. 952, 136 L.Ed.2d 840 (1997).

The Pennsylvania Supreme Court's lack of confidence in the reliability of the factfindings seems to us to be precisely the sort of 'undue influence' referred to in *Cosmas [see supra]* and encompassed by the Restatement (Second) of Torts § 667(1).[19] Even courts that today adhere to the view that a conviction notwithstanding reversal is proof of probable cause leave some opening for these situations where the reversal impugns the reliability or integrity of the factfinding in the initial conviction.

*Id.*

■ Reading the record in the light most favorable to Torres, we find that (1) the fact that the Commonwealth readily and voluntarily agreed to release Torres from prison before his sentence was completed, when coupled with, (2) the Commonwealth's decision not to re-prosecute Torres, and (3) the statements of Assistants in the Philadelphia District Attorney's Office, which call into question Officer McLaughlin's veracity, in addition to (4) the statement of Judge Brinkley, when she ordered Torres's immediate release from prison, are together competent evidence (at least sufficient to survive a motion for summary judgment) to bring into question the reliability and integrity of Torres's initial criminal conviction. We find, accordingly, that Torres's initial conviction is *not* conclusive proof that there was probable cause to prosecute him.

### c. *Favorable Termination*

■ The Pennsylvania Supreme Court has adopted § 659 of the Restatement (Second) of Torts, according to which a criminal proceeding is terminated in favor of the accused by, among other ways, "the formal abandonment of the proceedings by the public prosecutor." *Id.* at § 659(c). "If the charges were abandoned or withdrawn by the prosecutor this [is] sufficient to satisfy the element of prior favorable termination." *Robinson v. Robinson,* 362 Pa.Super. 568, 525 A.2d 367, 370 (1987); *see Woodyatt v.*

*Bank of Old York Road,* 408 Pa. 257, 182 A.2d 500, 501 (1962) ("[I]f the defendant is discharged after abandonment of the charges by the prosecutor, or the charges are withdrawn by the prosecutor, this is sufficient to satisfy the requisite element of prior favorable termination of the criminal action." (citing cases)).

The specific question of whether the entry of a *nolle prosequi* is a termination of the criminal proceedings in favor of the accused was addressed in *Haefner v. Burkey,* 534 Pa. 62, 626 A.2d 519 (1993), where the Pennsylvania Supreme Court held that the criminal action there had terminated in the accused's favor, such that he could assert a malicious prosecution claim, because the "prosecution formally abandoned the criminal proceedings against [the accused] when it *nolle prossed* the remaining charges because of insufficient evidence." *Id.,* 626 A.2d at 521.

■ Thus, under Pennsylvania law, "[a] favorable termination does not necessarily mean that the termination must be on the merits." *Brown v. Johnston,* 675 F.Supp. 287, 289 (W.D.Pa.1987) (citing, among other cases, *Woodyatt,* 408 Pa. 257, 182 A.2d 500). That is, "[a]ctual innocence is not required for a common law favorable termination...." *Smith v. Holtz,* 87 F.3d 108, 113 (3d Cir.), *cert. denied sub nom. Wambaugh v. Smith,* —— U.S. ——, 117 S.Ct. 611, 136 L.Ed.2d 536 (1996). "All that is required is that the termination must be consistent with the innocence of the accused." *Thomas v. E.J. Korvette, Inc.,* 329 F.Supp. 1163, 1168 (E.D.Pa. 1971), *rev'd on other grounds,* 476 F.2d 471 (3d Cir.1973); *see also Hilfirty v. Shipman,* 91 F.3d 573, 580 (3d Cir.1996) (noting that "only terminations that indicate that the accused is innocent ought to be considered favorable" (citing, *inter alia,* Restatement (Second) of Torts § 660 cmt. a ("Proceedings are 'terminated in favor of the accused' ... only when their final disposition is such as to indicate the innocence of the accused.")))[20]

---

**19.** *See* Restatement (Second) of Torts § 667 (1977) ("The conviction of the accused by a magistrate or trial court, although reversed by an appellate tribunal, conclusively establishes the existence of probable cause unless the conviction

was obtained by fraud, perjury or corrupt means.").

**20.** As the Court in *DeLaurentis v. City of New Haven,* 220 Conn. 225, 597 A.2d 807, 820 (1991) (citing many cases) recognized that:

Consistent with the case law in Pennsylvania, the weight of authority generally holds that when a prosecutor, without the defendant's procurement, voluntarily enters a *nolle prosequi*, the criminal case has terminated in the defendant's favor. *See* W. Page Prosser et al., *Prosser and Keeton on the Law of Torts* § 119, at 874 (5th ed. 1984) ("[I]t will be enough that the proceeding is terminated in such a manner that it cannot be revived, and the prosecutor, if he proceeds further, will be put to a new one. This is true, for example, ... [of] the entry of a nolle prosequi ..., where [it has] the effect of ending the particular proceeding and requiring new process or other official action to commence a new prosecution."); 1 Fowler V. Harper et al., *The Law of Torts* § 4.4, at 418–19 (2d ed. 1986) (case terminates in favor of the criminal defendant "if there is a voluntary dismissal by the prosecutor or an entry of a nolle prosequi"); Restatement (Second) of Torts § 659(c) ("Criminal proceedings are terminated in favor of the accused by the formal abandonment of the proceedings by the public prosecutor") & cmt. e (1977);[21] *Lopez v. City of New York*, 901 F.Supp. 684, 688 (S.D.N.Y.1995) ("Many authorities generally indicate that a voluntary dismissal by a prosecutor, or the entry of a *nolle prosequi* without the plaintiff's procurement, is a favorable termination.").[22]

■ Defendants, not surprisingly, assert that the underlying criminal prosecution did not have the power, but can only enter a nolle prosequi with the consent of the court, the proceedings are not terminated until the court has approved the entry. In either case, unless new proceedings are instituted, the formal abandonment of the proceedings by the public prosecutor is a final termination in favor of the accused. ...

Two concerns underlie the requirement of 'successful termination.' The first is the danger of inconsistent judgments if defendants use a vexatious suit or malicious prosecution action as a means of making a collateral attack on the judgment against them or as a counterattack to an ongoing proceeding. The second is the unspoken distaste for rewarding a convicted felon or otherwise 'guilty' party with damages in the event that the party who instituted the proceeding did not at that time have probable cause to do so.

As a leading commentator has noted, the requirement that the criminal prosecution terminate in favor of the accused is thus primarily important not as an independent element of the malicious prosecution action but only for what it shows about probable cause to bring the criminal action or the accused's guilt-in-fact, since a defendant in a malicious prosecution claim can escape liability by showing that the plaintiff was in fact guilty of the offense with which he was charged. *See* W. Page Prosser et al., *Prosser and Keeton on the Law of Torts* § 119, at 874, 885 (5th ed.1984); *see also* 3 J.D. Lee & Barry A. Lindahl, *Modern Tort Law* § 40.10, at 456 (Rev. ed. 1990) ("Some courts take the position that in order to constitute a favorable termination, the termination must tend to indicate the innocence of the accused, as opposed to termination on technical grounds or for procedural reasons."); 1 Fowler v. Harper et al., *The Law of Toris* § 4.4, at 418 (2d ed.1986).

21. Comment e of the Restatement (Second) of Torts § 659 instructs, in pertinent part, that:

The usual method by which a public prosecutor signifies the formal abandonment of criminal proceedings is by the entry of a nolle prosequi, either with or without the leave of court as the criminal procedure of the jurisdiction in question provides. If the public prosecutor has power to make such an entry without the consent of the court, the entry constitutes a termination of the proceedings in favor of the accused. If he does

22. The Commonwealth argues that the Court of Appeals for the Second Circuit has ruled that, as a matter of law, a dismissal of a prosecution in the interest of justice is not a termination in favor of the accused. *See* McLaughlin's Mem. of Law at 26 (citing *Singer*, 63 F.3d at 118). The case law is, however, far from clear in New York with regard to this point. *See Pinaud v. County of Suffolk*, 52 F.3d 1139, 1154 (2d Cir.1995) (noting that New York state court case law may suggest that "New York law permits a dismissal in the 'interest of justice' to constitute a favorable termination in certain instances" (citing *Hankins v. Great Atl. and Pac. Tea Co.*, 208 A.D.2d 111, 114, 622 N.Y.S.2d 678, 679 (1st Dep't 1995) (holding that a dismissal in the interest of justice does not, as a matter of law, bar a subsequent claim for malicious prosecution, since a contrary "rule would penalize those who are charged falsely as they would be constrained to proceed to trial at some financial, emotional and likely professional expense in order to be found not guilty. [Under such a regime], the only people who could succeed on a claim for malicious prosecution would be those who, because the arrest was questionable, would proceed to trial and judgment, while those whose arrests were truly and obviously invalid, would have the matter disposed of *ipso facto* and without litigation"))); *see also O'Brien v. Alexander*, 101 F.3d 1479, 1486–87 (2d Cir.1996) ("One district court understated the confusion in the case law when it noted that the favorable termination cases 'have reached varying results that are difficult to reconcile.' " (quoting *Lopez*, 901 F.Supp. at 688)).

not terminate in Torres's favor. We disagree:

- It is not disputed that the Commonwealth voluntarily agreed to a new trial for Torres and then immediately sought an entry of a *nolle prosequi* as the quickest way to have Torres released from prison. *See supra* Part II.A.2.a. (detailing how the Commonwealth readily agreed to Torres's release from prison).

- It is undisputed that the Commonwealth never sought to reopen the case against Torres. *See* Pa. R.Crim. P. 313; *Commonwealth v. Reider,* [255 Pa.Super. 163], 386 A.2d 559 (Pa.Super.Ct.1978) (holding that double jeopardy does not attach where criminal charges are *nol prossed*).

- Nor is it disputed that the Commonwealth's decision to agree to the entry of a *nolle prosequi* was *not* the result of a compromise with Torres. *Cf. Hilfirty,* 91 F.3d at 580 ("[T]he Pennsylvania Supreme Court has previously held that a prosecutor's decision to withdraw criminal charges pursuant to a compromise with the accused is not considered to be a termination sufficiently favorable to support a malicious prosecution claim." (citing *Alianell v. Hoffman,* [317 Pa. 148], 176 A. 207 (Pa.1935))).

We find that the weight of authority holds that the entry of a *nolle prosequi,* such as the one in Torres's criminal case, is sufficient to satisfy the requirement in a malicious prosecution claim that the underlying criminal prosecution terminate in the plaintiff's favor.[23]

### B. *Commander John Sunderhauf*

Defendant John Sunderhauf, the Zone Commander of the Philadelphia Region of the Attorney General's Bureau of Narcotics Investigation (one of the agencies Officer McLaughlin worked for when he arrested Torres), argues that he cannot he held personally liable for the constitutional violation alleged here because (1) Officer McLaughlin did not violate Torres's constitutional rights, and/or (2) he did not supervise Officer McLaughlin "with respect to any role McLaughlin played in effecting the only possible Fourth Amendment seizure—the jury verdict and the revocation of bail." McLaughlin's Mem. of Law at 28–29.

■ Sunderhauf's first assertion is to no avail: our discussion above should leave no doubt that a jury may very well determine that Torres's Fourth Amendment rights were, in fact, violated. *See* Part II.A.1. Sunderhauf's view that the Assistant District Attorney rather than he was Officer McLaughlin's "supervisor" at trial is equally without merit. As we explained above, *see supra* Part II.A.2.a., there is sufficient evidence to suggest that Officer McLaughlin is liable for the initiation of Torres's criminal prosecution.

We shall, therefore, not dismiss Commander Sunderhauf from this suit.

### C. *The Monell Claim Against the City of Philadelphia*

In *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court opened the door to municipal liability under § 1983, but it also held that such liability cannot rest upon principles of *respondeat*

---

**23.** Section 660 of the Restatement (Second) of Torts specifies the types of terminations of a criminal proceeding that do *not* satisfy the requirements of a cause for malicious prosecution. *See Hilfirty,* 91 F.3d at 580 (Pennsylvania Superior Court has adopted § 660). Section 660 instructs that:

A termination of criminal proceedings in favor of the accused other than by acquittal is not a sufficient termination to meet the requirements of a cause of action for malicious prosecution if
(a) the charge is withdrawn or the prosecution abandoned pursuant to an agreement of compromise with the accused; or

(b) the charge is withdrawn or the prosecution abandoned because of misconduct on the part of the accused or in his behalf for the purpose of preventing proper trial; or
(c) the charge is withdrawn or the proceeding abandoned out of mercy requested or accepted by the accused; or
(d) new proceedings for the same offense have been properly instituted and have not been terminated in favor of the accused.

It is thus clear that § 660 does not bar Torres from asserting a malicious prosecution claim.

*superior.* Later cases have made clear that only "the 'execution of the government's policy or custom'" will subject a municipality to a judgment. *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1202–03, 103 L.Ed.2d 412 (1989) (quoting *Springfield v. Kibbe,* 480 U.S. 257, 267, 107 S.Ct. 1114, 1119–20, 94 L.Ed.2d 293 (1987)). *Collins v. City of Harker Heights,* 503 U.S. 115, 122, 112 S.Ct. 1061, 1067, 117 L.Ed.2d 261 (1992), for example, emphasized the "separate character of the inquiry into the question of municipal responsibility and the question whether a constitutional violation occurred." *Id.* As the Supreme Court did in *Oklahoma City v. Tuttle,* 471 U.S. 808, 821, 105 S.Ct. 2427, 2435, 85 L.Ed.2d 791 (1985), and *City of Canton,* 489 U.S. at 388 n. 8, 109 S.Ct. at 1204 n. 8, in our analysis of Torres's *Monell* claim we will assume that Officer McLaughlin violated Torres's Fourth Amendment rights.

*City of Canton* held that a plaintiff might prove a *Monell* claim if "a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." *City of Canton,* 489 U.S. at 389, 109 S.Ct. at 1205. The Supreme Court emphasized, however, that failure-to-train claims arise only in "limited circumstances". *Id.* at 387, 109 S.Ct. at 1203–04. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *Id.* at 389, 109 S.Ct. at 1205.

■ In four important respects, *City of Canton* describes failure-to-train liability in the negative. First, a city would not be liable under § 1983 if, "without more, … one of its employees happened to apply the policy in an unconstitutional manner, for liability would then rest on *respondeat superior.*" *Id.* at 387, 109 S.Ct. at 1204. Nor is it sufficient to show "[t]hat a particular officer

may be unsatisfactorily trained …, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390–91, 109 S.Ct. at 1206. Third, a plaintiff cannot meet his burden by showing "that an injury or accident could have been avoided if an officer had had better or more training" since "[s]uch a claim could be made about almost any encounter resulting in injury". *Id.* at 391, 109 S.Ct. at 1206. Finally, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *Id.* Underlying these examples is the principle that a plaintiff who pursues a *Monell* claim must show more than just an alleged civil rights violation. At issue in a *Monell* claim is a *city's* deliberate indifference, and the conduct of one of its employees, without more, generally cannot create a jury question on that point.

■ The evidence Torres has presented in response to the City of Philadelphia's summary judgment motion is insufficient to meet these standards. Torres, in support of his *Monell* claim, cites (1) nine citizen complaints against McLaughlin over a eleven year period, (2) the fact that McLaughlin was not disciplined for any of these complaints, (3) the Police Department's failure to properly investigate the citizen complaints, and (4) and the City of Philadelphia's alleged failure to supervise McLaughlin properly. *See* Pl.'s Response to City of Philadelphia's Mot. for Summ. J. at 7th unnumbered page.[24]

The citizen complaints cannot serve as a basis for the *Monell* claim. Eight of the complaints were found to be unsubstantiated and one was withdrawn. *See id.* The mere fact that eight of the complaints were found to be unsubstantiated is not, standing alone, evidence that the City of Philadelphia failed adequately to investigate the complaints or

**24.** Torres does not contest the fact that Commander Sunderhauf was not an employee of the City of Philadelphia. The parties do, however, disagree as to whether Officer McLaughlin was, at the relevant period of time at issue here, an employee of the City of Philadelphia and/or the Commonwealth of Pennsylvania. *See* City of Philadelphia's Mem. of Law at n. 2 & Pl.'s Response to City of Philadelphia's Mot. for Summ. J. at 5th unnumbered page. Because we find that, in either case, Torres's *Monell* claim cannot survive the City of Philadelphia's motion for summary judgment, we need not and will not resolve this interesting issue.

failed properly to discipline McLaughlin. Torres has not proffered any competent evidence regarding the nature of the investigation (or lack thereof) into the citizen complaints against McLaughlin. Indeed, we know nothing about these complaints.

Finally, Torres's claim that McLaughlin was improperly supervised is based solely on McLaughlin's deposition testimony that he had several supervisors in the chain of command at any one time. This is wholly inadequate evidence to support an allegation of improper supervision. We shall, therefore, dismiss Torres's *Monell* claim against the City of Philadelphia.

An appropriate Order follows.

### ORDER

AND NOW, this 5th day of June, 1997, upon consideration of defendants' motions for summary judgment, the plaintiff's responses, and defendants' replies, and in accordance with the accompanying Memorandum Opinion, it is hereby ORDERED that:

1. John McLaughlin's motion for summary judgment is DENIED;

2. John Sunderhauf's motion for summary judgment is DENIED;

3. The City of Philadelphia's motion for summary judgment is GRANTED; and

4. In view of paragraph 3, JUDGMENT IS ENTERED in favor of defendant City of Philadelphia and against plaintiff Felix Torres on all claims in the complaint.